# In the United States Court of Federal Claims

No. 16-492L

(Filed:  September 29, 2020)

| | |
|---|---|
| **CHEMEHUEVI INDIAN TRIBE,** | RCFC 12(b)(1); RCFC 12(b)(6); |
| *Plaintiff,* | Tucker Act jurisdiction; Indian Tucker Act; statute of limitations; |
| **v.** | 28 U.S.C. § 2501; claim accrual; tolling; meaningful accounting; |
| **THE UNITED STATES,** | Indian Trust Accounting Statute; American Indian Trust Fund |
| *Defendant.* | Management Reform Act; usufructuary water rights. |

*Roger J. Marzulla*, Marzulla Law, LLC, Washington, D.C., for Plaintiff.  With him on the briefs was *Nancie G. Marzulla*, Marzulla Law, LLC, Washington, D.C.  Of counsel was *Mario Gonzalez*, Gonzalez Law Office, Rapid City, SD.

*Davene D. Walker*, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., for Defendant.  With her on the briefs were *Prerak Shah*, Deputy Assistant Attorney General, United States Department of Justice, Environment and Natural Resources Division, and *Peter Dykema*, United States Department of Justice, Environment and Natural Resources Division.  Of counsel were *Dondrae Maiden* and *Karen Boyd*, Office of the Solicitor, United States Department of the Interior, Washington, D.C., and *Thomas Kearns*, Office of the Chief Counsel, United States Department of the Treasury, Washington, D.C.

## OPINION AND ORDER

**SOLOMSON, Judge.**

Around the time of the establishment of this Court's predecessor tribunal — the United States Court of Claims — Albert Bierstadt became a renowned painter of our country's storied westward expansion.  Depicting sweeping landscapes on immense canvases, Bierstadt "offered a war-torn nation a golden image of their own Promised Land."[1]  The paintings are visually arresting, but have been "criticized [as] overly

---

[1] National Gallery of Art, *Albert Bierstadt*, https://www.nga.gov/collection/artist-info.6707.html (last visited Sept. 22, 2020).

romanticized."[2]  Bierstadt's paintings thus are a metaphor for the expansion of our Great Nation itself:  its rise was a marvel, but the idealized version of that history, as we now recognize, does not present the full picture.  Indeed, a heavy cost was imposed — often unjustly — on the Native American Indian tribes that inhabited the continent long before the formation of the United States.

Over the course of the next century and continuing into this one, Congress sought — as our country always does — to remedy past wrongs,[3] a process in which our Court has played no small part, dating back to the Indian Claims Commission Act,[4] and thereafter pursuant to the Indian Tucker Act, 28 U.S.C. § 1505.  The latter statute serves as the basis for this Court's jurisdiction over "any claim against the United States accruing after August 13, 1946, in favor of any [American Indian] tribe . . . whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group."  *Id.*

In exercising such jurisdiction, however, Congress has empowered us to adjudicate monetary claims — and enter judgment against the United States — only where consistent with the laws it has duly enacted, binding precedent, this Court's Rules, and with the recent pronouncement of the United States Supreme Court firmly in mind:  "'[C]ourts are essentially passive instruments of government'" that "'do not, or should not, sally forth each day looking for wrongs to right.'"  *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of reh'g en banc)).

Accordingly, but with abundant sympathy for the Plaintiff — the Chemehuevi Indian Tribe (the "Chemehuevi" or the "Tribe") — this Court is compelled to grant the government's motion to dismiss the Tribe's Second Amended Complaint (the "Complaint").  At bottom, the Complaint is long on history and legal conclusions but almost entirely devoid of operative facts.  And although the history is often troubling, to say the least, the Tribe's claims are barred by the statute of limitations, erroneous as a matter of law, so equivocal as to fail to state a claim, or plainly outside of this Court's jurisdiction.  Indeed, even after more than two years of exhaustive jurisdictional discovery, the Tribe's Complaint is a jumbled puzzle that once properly arranged and

---

[2] Google Arts & Culture, *Who was Albert Bierstadt?*,  https://artsandculture.google.com/theme/who-was-albert-bierstadt/4QIyO2vqqR5LKg?hl=en (last visited Sept. 22, 2020).

[3] "Congress recognized its duty to clean the Augean stables of past generations and correct, in part, wrongs accorded the Indians by giving them a fair day in court to seek redress of their legitimate grievances."  *Klamath & Modoc Tribes & Yahooskin Band of Snake Indians v. United States*, 174 Ct. Cl. 483, 487 (1966).

[4] Indian Claims Commission Act, Pub. L. No. 79-726, 60 Stat. 1049 (Aug. 13, 1946) [hereinafter "the ICCA"].

viewed even in the light most favorable to the Tribe, reveals that it has backed itself into a corner from which it cannot proceed further.

## I.   Background

### A.   Factual Background[5]

Prior to the westward migration of American settlers, the Chemehuevi "used and occupied the Mojave Desert's mountains and canyons and the Colorado River shoreline." ECF No. 45 [hereinafter "Compl."] ¶ 7.  By the mid-nineteenth century, the Chemehuevi "were living with the Mojave Indians near the present-day Fort Mojave Indian Reservation." *Id.* ¶ 8.  In 1865, the Chemehuevi and the Mojave Indians moved "to the newly established Colorado River Indian Reservation in Arizona." *Id.*  In 1875, however, many Chemehuevi "moved back to the Chemehuevi Valley." *Id.* ¶ 10.  The Chemehuevi subsequently requested that the Federal Government set aside land for the Tribe in the Chemehuevi Valley.  *Id.*

On February 2, 1907, the Secretary of the Interior "withdrew certain lands for the Chemehuevi on the California side of the Colorado River with the Colorado River as the eastern boundary." Compl. ¶ 11.  The Secretary's order thus "established the 36,000-acre Chemehuevi Indian Reservation." *Id.*

On February 10, 1933, the Department of the Interior's Bureau of Reclamation entered into a cooperative agreement with the Metropolitan Water District ("MWD") of Southern California to construct and operate a dam on the Colorado River.  Compl. ¶ 14.  On August 25, 1934, pursuant to the terms of the agreement, MWD advanced

---

[5] The government's motion to dismiss challenges the factual basis for the Court's subject-matter jurisdiction (*i.e.*, regarding the statute of limitations).  Accordingly, for the purposes of resolving that motion, "the allegations in the complaint are not controlling." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citing *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 277–79 (1936)).  Rather, the Court has accepted as true "only uncontroverted factual allegations" and has made factual findings regarding the "controverted jurisdictional allegations." *Id.* at 1583–84.  The government also moves to dismiss the Complaint for failure to state a claim.  For the purposes of resolving that motion, this Court assumes, as it must, that the factual allegations contained in the Tribe's Complaint are true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[F]or the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The Court also has considered "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record," which the Court properly may consider without converting the motion to dismiss into a motion for summary judgment. *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).  Nonetheless, the Court has derived this factual background section from the allegations in the Complaint.

funds to the Bureau of Reclamation, which then entered into a contract with a company to construct the Parker Dam on the Colorado River.  *Id.* ¶ 15.

Approximately five years into construction of the Parker Dam, on December 15, 1939, the Department of the Interior's Solicitor concluded that the Tribe was entitled to compensation for damage to certain tribal lands that the Parker Dam would eventually flood.  Compl. ¶ 21.  In the Act of July 8, 1940, Congress authorized the taking of the Tribe's land "in aid of construction of the Parker Dam Project" and provided that "[t]he Secretary shall determine the amount of money to be paid to the [Tribe] as just and equitable compensation."  *Id.* ¶ 23.  Further, Congress noted that "[s]uch amount of money shall be paid to the Secretary by the [MWD], in accordance with the terms of the contract made and entered into on February 10, 1933 between the Interior, and the [MWD]" and that the Secretary then shall deposit such funds "in the Treasury of the United States" for the benefit of the Tribe.  *Id.* ¶ 23.

On October 9, 1940, the Acting Secretary of the Department of the Interior "approved payment to the Chemehuevi[] of $108,104.95" as just compensation for the land taken as a result of the Parker Dam Project.  Compl. ¶ 26.  Subsequently, MWD paid the government $108,104.95, and the government placed the funds in an account in the Treasury of the United States.  *Id.* ¶ 30.  The Tribe alleges that the government deposited the funds in account number "14X7344" and that the government subsequently breached its fiduciary duties to the Tribe with respect to those funds.  *Id.* ¶¶ 33, 73(a)–(q).[6]

---

[6] In Paragraphs 73(a) through (q), the Tribe — without factual support — generally alleges that the government breached its fiduciary duties with respect to all the funds and assets that the government has held in trust for the Chemehuevi.  In particular, the Tribe claims that the government (a) "[f]ail[ed] to invest, or under-invest[ed], funds," (b) "[f]ail[ed] to properly manage and/or invest congressionally appropriated funds, and other trust monies, in a manner that obtains the maximum return," (c) "[f]ail[ed] to obtain the highest available rates of interest and earnings," (d) "[f]ail[ed] to deposit and/or properly invest trust monies in interest bearing accounts," (e) "[f]ail[ed] to obtain the highest and best price for the use and/or taking of trust land and assets," (f) "[f]ail[ed] to charge, or collect rents, royalties or other proceeds," (g) "[f]ail[ed] to administer and manage trust lands, funds and assets with the greatest skill and care," (h) "[f]ail[ed] to maximize the productive use of trust land and natural resources," (i) "[f]ail[ed] to provide the consideration it agreed to provide, or was required to provide," (j) "[f]ail[ed] to charge, enforce and collect . . . penalties," (k) "[f]ail[ed] to require lessors and others users of trust assets to procure bonds, insurance or surety arrangements," (l) "fail[ed] to pay the Tribe the interest, or compound interest, on certain liquidated amounts and judgments," (m) "[e]nter[ed] into or authoriz[ed] below market value contracts, leases, permits, rights- of-way and other similar arrangements," (n) "convey[ed] or allow[ed] the conveyance of trust assets and/or resources to third parties without adequate compensation and protections," (o) "[e]ngag[ed] in self-dealing," (p) "[a]llow[ed] government agencies and/or third parties to use, remove, encumber, commit waste, damage, spoil and otherwise take possession of the

On August 11, 1951, the Tribe filed a petition with the Indian Claims Commission ("ICC"), which the ICC designated as Docket No. 351, concerning a separate taking, unrelated to the Parker Dam Project.  Compl. ¶ 40.  On January 11, 1951, the ICC separated Docket No. 351 into two claims:  (1) "a claim for a taking of Chemehuevi aboriginal title land in the present states of California, Arizona and Nevada" and (2) "a claim for the accounting and other relief.  *Id.* ¶ 41.

On July 6, 1964, the Tribe's attorneys in the ICC matters submitted a settlement offer to the government.  Compl. ¶ 45.  On December 17, 1964, the parties entered into a "Final Stipulation For Entry Of Final Judgment," in which "Dockets 351 and 351-A were settled, after deductions, credits and offsets, for a net judgment of $996,834.81."  *Id.* ¶ 47.  By the Act of June 30, 1965, Congress appropriated the requisite funds to pay the judgment to the Tribe, and, by the Act of September 25, 1970, Congress "authorized for distribution [the ICC judgment funds] in *per capita* payments" to Tribe members.  *Id.* ¶ 48.  The Tribe is unsure whether the government distributed all of the funds in *per capita* payments to the Tribe's members, but the Tribe now alleges that it is entitled to claim any undistributed payments if such payments exist.  *Id.* ¶ 50.

On March 9, 1964, the United States Supreme Court issued a decree in *Arizona v. California*, 376 U.S. 340 (1964) ("*1964 Arizona Decree*").  Compl. ¶ 103.  The *1964 Arizona Decree* explained that the Tribe had certain water rights in the Colorado River.  *Id.*  In particular, the *1964 Arizona Decree* specified that the Tribe was entitled to "annual quantities not to exceed (i) 11,340 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for irrigation of 1,900 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less, with a priority date of February 2, 1907."  *Id.*  The Tribe alleges that the Chemehuevi have used "only a small portion of the Tribe's annual allocation of water from the Colorado River" since the Supreme Court issued the *1964 Arizona Decree* and that the government "has made that water available to other junior users, such as the MWD, without any compensation to the Tribe" and in breach of the fiduciary duties the government owes the Tribe.  *Id.* ¶¶ 107–08.

In 1970, the Tribe adopted a federally recognized constitution and "was reinstated under the Indian Reorganization Act of 1934."  Compl. ¶¶ 30, 85.

On November 1, 1974, the Secretary of the Interior issued an order, returning to the Tribe twenty-one miles of shoreline along the Colorado River, which the government had previously taken from the Tribe — and for which the Tribe was

---

Tribe's trust lands and assets," and (q) "never provided the Chemehuevi Tribe with a complete, meaningful accounting of its trust funds and assets."  Compl. ¶¶ 73(a)–(q).  Those are all conclusory legal assertions, and the Tribe's Complaint does not contain a single factual allegation to support any of the legal conclusions in the laundry list of breaches that the government purportedly committed.

compensated — in connection with the Parker Dam Project.  Compl. ¶ 125.  The order purported to "correct[] the designation by Secretary Ickes of November 25, 1941, that certain lands of the Chemehuevi Indian Reservation should be taken for use in the construction of Parker Dam pursuant to the Act of July 8, 1940."  *Id.*  The Tribe implicitly recognizes that the government previously had compensated the Chemehuevi for this taking as a permanent one.  *Id.* ¶ 128.  Nevertheless, the Tribe alleges that the government owes the Tribe yet additional compensation for the twenty-one miles of shoreline that the government returned to the Tribe.  *Id.*

On October 25, 1994, Congress enacted the American Indian Trust Fund Management Reform Act of 1994 ("ITFMRA").  Pub. L. No. 103–412, 108 Stat 4239 (Oct. 25, 1994), *codified at* 25 U.S.C. § 4001 *et seq.*  The ITFMRA requires the Secretary of the Interior to provide timely and accurate reconciliations of tribal trust funds, audit all tribal trust funds annually, and provide periodic statements of performance for the tribal trust fund assets beginning in 1995 on a prospective basis.  *Id.*  The government contracted with Arthur Andersen LLP ("Arthur Andersen") to audit and reconcile the Tribe's trust fund accounts for the time period from July 1, 1972 to September 30, 1992.  On March 1, 1996, the Tribe received its report (the "1996 Arthur Andersen Report"), along with approximately 6,000 images, which included "about 400 Deposit Tickets, about 60 Vouchers and Schedules of Payment, about 40 Reconciliation Checklists, about 15 Notices for Missing Deposit Tickets, two decisions of the Indian Claims Commission, a cover letter from the Bureau of Indian Affairs [("BIA")], a report summary [], a report for fiscal years 1993-1995, correspondence regarding the Coopers & Lybrand closeout letter, and miscellaneous documents concerning the preparation of the report."  ECF No. 91 [hereinafter "Pl. Supp. Br."] at 1 (internal citations omitted).  The Tribe alleges that the 1996 Arthur Andersen Report was not a meaningful accounting and that it "severely limited the Chemehuevi Tribe's ability to determine the full extent of its losses as a result of the Federal Government's breaches of its fiduciary duties."  Compl. ¶ 143.

The Tribe's Complaint does not contain any factual allegations that support any of the Tribe's claims and which occurred between March 1, 1996, and the filing of the Tribe's complaint in this Court on April 20, 2016.

### B.    Procedural History

On April 20, 2016, the Tribe filed its original complaint in this Court.  ECF No. 1.  The Tribe's original complaint did not contain any specifically enumerated counts but sought "monetary damages against the United States . . . for breaches and continuing breaches of the United States' constitutional, statutory and common law fiduciary duties owed to [the] Tribe."  *Id.* at 1.  In particular, the Tribe's original complaint alleged fiduciary breaches by the United States in connection with the Tribe's Parker Dam compensation funds, ICC judgment funds, and other unspecified "funds currently or previously held in trust for the Tribe."  *Id.* at 5–9.  The Tribe sought "monetary damages

in an amount to be determined," an "accounting in aid of jurisdiction to render the monetary judgment," and attorney fees.  *Id.* at 20.

On August 19, 2016, the government moved to dismiss the Tribe's original complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  ECF No. 7.  The government primarily asserted that the statute of limitations, 28 U.S.C. § 2501, barred the Tribe's claims.  *Id.* at 1.  On October 19, 2016, the Tribe filed its response in opposition to the government's motion to dismiss.  ECF No. 10.  On November 22, 2016, the government filed its reply brief.  ECF No. 13.

On February 23, 2017, then-Chief Judge Campbell-Smith issued an order denying the government's motion to dismiss.  ECF No. 14.  The decision explained that the Tribe's original complaint "include[d] a wide range of allegations," which were "so expansive . . . that the court . . . had a difficult time enumerating the specific claims under which plaintiff seeks relief."  *Id.* at 4.  As a result, the Court could not "confidently determine which of plaintiff's claims might survive defendant's motion to dismiss, and which might not."  *Id.*  Rather than dismiss the Tribe's original complaint, however, the Court determined that a "middle path . . . between . . . outright dismissal . . . and proceeding to full discovery" was appropriate.  *Id.*  The Court directed the Tribe "to file an amended complaint that includes specifically enumerated claims" which "clearly identify the legal basis for the claim and the relevant allegations," paying "special attention to identifying relevant dates, given the complexity of the statute of limitations issues."  *Id.*  The Court also believed that "limited jurisdictional discovery" might be necessary and ordered the "deadline for answering or otherwise responding to the amended complaint . . . stayed" so that the parties could confer regarding whether such discovery was necessary.  *Id.*  On April 3, 2017, the Tribe filed its first amended complaint.  ECF No. 15.

The "limited jurisdictional discovery" ordered by this Court lasted more than two years, however, and included a half-dozen motions for extensions of time.  ECF No. 23; ECF No. 27 (noting that the government had "transmitted 369 documents (4,191 images) to Plaintiff's counsel," with plans to produce additional documents "every week or every other week"); ECF No. 29 (government representing that it had "produced 3,139 non-privileged documents (10,568 images or pages) to Plaintiff"); ECF No. 34 (Tribe explaining that the government had **completed** its production — producing "well over 12000 images" — approximately five weeks prior to the Tribe's filing the motion); ECF No. 39 (Tribe explaining that the "government ha[d] produced 11,401 non-privileged documents (48,774 images or pages)"); ECF No. 41;  ECF No. 43 (noting that Tribe needed "additional time to consider the [additional] 1,594 documents (6,975 images) the Defendant produced to Plaintiff").

On April 15, 2019, the Tribe filed its second amended complaint in this Court.  ECF No. 45 (the "Complaint," as defined *supra*).  On June 24, 2019, the government filed its motion to dismiss the Tribe's Complaint pursuant to RCFC 12(b)(1) and RCFC

12(b)(6).  ECF No. 56-1 [hereinafter "Def. Mot."].  On August 12, 2019, the Tribe filed its response in opposition to the government's motion to dismiss.  ECF No. 61 [hereinafter "Pl. Resp."].  On September 23, 2019, the government filed its reply to the Tribe's response to the motion to dismiss.  ECF No. 64 [hereinafter "Def. Rep."].

On October 7, 2019, the Tribe filed a motion for leave to file a sur-reply in opposition to the government's motion to dismiss.  ECF No. 67.  On October 9, 2019, the government filed a response opposing the Tribe's motion for leave to file a sur-reply.  ECF No. 68.  On October 22, 2019, the Court granted the Tribe's motion for leave to file a sur-reply and ordered the Tribe to file its sur-reply by October 29, 2019.  ECF No. 69.  On October 25, 2019, the Tribe filed its sur-reply in opposition to the government's motion to dismiss.  ECF No. 70 [hereinafter "Pl. Sur."].  On November 8, 2019, the government filed its supplemental response to the Tribe's sur-reply.  ECF No. 71 [hereinafter "Def. Sur."].

On February 5, 2020, this case was reassigned to the undersigned Judge.  ECF No. 72.  At that point, the government had produced 17,298 documents (70,430 images) during a Court-approved "limited jurisdictional discovery" period; the Tribe had filed its third iteration of its complaint; and the parties had filed five separate briefings in support of their respective positions on the government's most recent motion to dismiss the Complaint.

On March 11, 2020, the Court held a status conference to discuss the case.  Following the March 11, 2020, status conference, the Court ordered the parties to file a summary table "to assist the Court in understanding the Tribe's" Complaint.  ECF No. 76 at 3.  On April 1, 2020, the government filed the summary table on behalf of both parties.  ECF No. 79 [hereinafter "Joint Sum. Table"].  On April 14, 2020, the Court held a status conference to discuss the parties' summary table and to schedule oral argument on the government's motion to dismiss the Tribe's Complaint.

On May 11, 2020, the Court ordered the Tribe "to file a status report . . . indicating:  (1) the electronic filing docket entry that contains the full Arthur Andersen Report referenced in the Complaint; and (2) where Plaintiff's brief in response to the government's motion to dismiss . . . addresses the government's argument regarding the basis for the Arthur Andersen Report."  ECF No. 85 at 2.  The Court explained that the "Arthur Andersen Report is integral to both the Plaintiff's Complaint and to this Court's resolution of the government's motion to dismiss."  *Id.* at 1–2.  On May 12, 2020, the Tribe filed a status report, explaining that the "Tribe's Arthur Andersen report ha[d] not been filed in this case, and the Tribe ha[d] been unable at this time to locate the original 1996 document."  ECF No. 86 at 1.  The status report further explained, however, that the government had provided the Tribe's counsel with a report — although perhaps not the entire 1996 Arthur Andersen Report — which the Tribe attached as an exhibit to its status report.  *Id.* at 1 n.2.

On May 13, 2020, the Court heard oral argument on the government's motion to dismiss the Tribe's Complaint. *See* ECF No. 89 [hereinafter "Tr."].  On May 14, 2020, the Court ordered the "parties to file supplemental briefing (1) describing the additional documents that the government provided to the Plaintiff as part of the Arthur Andersen Report, (2) identifying when the government first provided those documents to the Plaintiff, and (3) explaining the significance of those documents with respect to whether they collectively constitute a 'meaningful accounting' as the U.S. Court of Appeals for the Federal Circuit used that phrase in *Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed. Cir. 2004)."  ECF No. 87 at 2.  The Court also ordered the parties "to identify any decision of the U.S. Supreme Court, the Federal Circuit, or this Court, holding that: ***both*** (1) the government has (or had) an independent fiduciary duty to provide Plaintiff with an accurate accounting of its trust accounts; ***and*** (2) that duty is itself money-mandating, such that the government's failure to provide an accurate or complete accounting alone may constitute a compensable breach of the government's fiduciary duty, which this Court has jurisdiction to resolve."  *Id.* (emphasis in original).  On May 28, 2020, the government filed its supplemental brief, ECF No. 90 [hereinafter "Def. Supp. Br."], and on June 4, 2020, the Tribe filed its supplemental brief.  Pl. Supp. Br.

## C.   The Tribe's Complaint And The Government's Motion To Dismiss

The Tribe's Complaint contains five specific counts:  (1) Count I is a "claim for accounting and damages for mismanagement of Parker Dam compensation monies," Compl. ¶¶ 74–91 (Count I) (capitalization altered); (2) Count II is a "claim for accounting and damages for ICC judgment funds for Dockets 351 and 351-A," Compl. ¶¶ 92–97 (Count II) (capitalization altered); (3) Count III is a claim for "uncompensated taking and mismanagement of tribal water rights," Compl. ¶¶ 98–123 (Count III) (capitalization altered); (4) Count IV is a "claim for accounting and damages for mismanagement of shoreline and suspense accounts," Compl. ¶¶ 124–37 (Count IV) (capitalization altered); and (5) Count V is a claim that the "199[6] Arthur Andersen Report failed to meet the government's statutory obligation to provide the Chemehuevi Tribe with an accounting of the Tribe's trust funds."  Compl. ¶¶ 138–45 (Count V) (capitalization altered).[7]

---

[7] Then-Chief Judge Campbell-Smith's original decision, denying the government's motion to dismiss, explained that the Tribe's original complaint "include[d] a wide range of allegations," which were "so expansive . . . that the court . . . had a difficult time enumerating the specific claims under which plaintiff seeks relief."  ECF No. 14 at 4.  While the Tribe's Complaint now contains five enumerated counts, the range of allegations is still so expansive and difficult to follow that the Court has had trouble understanding the particular factual and legal bases for the Tribe's various claims and the distinctions between them.  *See* ECF No. 76 (ordering summary table).  To the extent that this opinion does not specifically address a claim that the Tribe has included within its specifically enumerated counts, or elsewhere in the Complaint, the Court has considered the entirety of the Complaint and dismisses the Tribe's claims either for

Pending before the Court is the government's motion to dismiss the Complaint in its entirety.  In particular, the government asserts that the statute of limitations, 28 U.S.C. § 2501, bars each of the counts and that the Tribe has failed to state a claim in Counts II–IV on which the Court may grant relief.  *See* Def. Mot. at 13–21, 32–38.

## II.    Standard Of Review

The government moves to dismiss the Complaint pursuant to RCFC 12(b)(1) and RCFC 12(b)(6) for, respectively, lack of jurisdiction and failure to state a claim upon which relief can be granted as a matter of law.

There are two categories of jurisdictional attacks that a defendant in any court may assert:  facial and factual.

A facial jurisdictional attack "challenges whether the court's subject-matter jurisdiction was properly pleaded."  Steven S. Gensler & Lumen N. Mulligan, 1 *Federal Rules of Civil Procedure, Rules and Commentary, Rule 12* (Feb. 2020 Update) [hereinafter "*Federal Rules & Commentary*"]; *see also Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1355 (Fed. Cir. 2018) (addressing "facial challenge").  A facial attack itself can take two forms.  A defendant either can "assert that the plaintiff has failed to plead jurisdiction as required by Rule 8(a)(1)" or "assert that, while properly pleaded per Rule 8(a)(1), the allegations — even when assumed to be true — fail to establish jurisdiction under the relevant statute or constitutional provision."  *Federal Rules & Commentary*.  Regarding facial attacks, the Federal Circuit has explained:

> [W]e join the majority of our sister circuits in holding that the Supreme Court's "plausibility" requirement for facial challenges to claims under Rule 12(b)(6), as set out in [*Twombly*, 550 U.S. at 570], and [*Iqbal*, 556 U.S. at 678], also applies to facial challenges to subject-matter jurisdiction under Rule 12(b)(1).

*Crow Creek Sioux Tribe*, 900 F.3d at 1354–55.  Thus, "[t]hreadbare recitals of [claim] elements . . ., supported by mere conclusory statements, do not suffice" to confer jurisdiction.  *Id.* (quoting *Iqbal*, 556 U.S. at 678).

A factual attack, on the other hand, "challenges the truth of the jurisdictional facts alleged in the complaint."  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988).  Once the government lodges a factual attack against a complaint that purports to invoke the Court's subject-matter jurisdiction, the burden shifts to the plaintiff to "establish[] subject matter jurisdiction by a preponderance of the evidence."

---

lack of subject-matter jurisdiction based on the statute of limitations or for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(1) and 12(b)(6), respectively.

*Id.* at 748.  The Court "may consider relevant evidence in order to resolve the factual dispute" but must afford the plaintiff an "opportunity to be heard before dismissal is ordered[.]"  *Id.* at 747–48.

When considering a facial jurisdictional attack or a motion to dismiss a complaint for failure to state a claim upon which relief may be granted pursuant to RCFC 12(b)(6), the Court accepts as true all *factual* allegations — but not legal conclusions — contained in a plaintiff's complaint.  *See Twombly*, 550 U.S. at 555.  For a plaintiff's complaint to survive a motion to dismiss, the Court — viewing the facts in the light most favorable to the plaintiff — must conclude that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable, and that a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (citations and internal quotation marks omitted); *Chapman Law Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 938 (Fed. Cir. 2007) (noting that the Court's duty is not to determine "whether the claimant will ultimately prevail" when ruling on a 12(b)(6) motion to dismiss).  On the other hand, a plaintiff may not simply plead "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555 (citations omitted).[8]

To defeat a motion to dismiss based on the statute of limitations, a plaintiff must establish "jurisdictional timeliness."  *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)).  A plaintiff cannot rely merely on the allegations in the complaint if the factual basis for jurisdiction is challenged.  *Reynolds*, 846 F.2d at 747.  "Because plaintiff

---

[8] "Pursuant to RCFC 12(c), the trial court may convert a motion to dismiss into a motion for summary judgment under RCFC 56 if it relies on evidence outside the pleadings."  *Brubaker Amusement Co. v. United States*, 304 F.3d 1349, 1355 (Fed. Cir. 2002).  "Whether to accept extra-pleading matter on a motion for judgment on the pleadings and to treat the motion as one for summary judgment is within the trial court's discretion."  *Easter v. United States*, 575 F.3d 1332, 1335 (Fed. Cir. 2009) (discussing RCFC 12(b)(6)).  To assess the merits of the government's motion to dismiss pursuant to RCFC 12(b)(6), the Court has considered "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record," which the Court properly may consider without converting the motion to dismiss into a motion for summary judgment.  *Dimare Fresh, Inc.*, 808 F.3d at 1306 (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)); *see supra* note 5.  To assess the merits of the government's motion to dismiss pursuant to RCFC 12(b)(1), the Court has considered matters extrinsic to the pleadings.  The Court, however, has not converted the motion to dismiss into a motion for summary judgment.  "In resolving . . . disputed predicate jurisdictional facts, 'a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings . . . .'"  *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012) (quoting *Cedars-Sinai*, 11 F.3d at 1584).

bears the burden of proof by a preponderance of the evidence, it must offer relevant, competent evidence to show that it filed suit within six years of the accrual of its claims." *Osage Nation v. United States*, 57 Fed. Cl. 392, 396 (2003) (citing 28 U.S.C. § 2501; *Reynolds*, 846 F.2d at 748; *Martinez v. United States*, 48 Fed. Cl. 851, 857 (2001)).

## III.   The Indian Tucker Act And Breach Of Fiduciary Duty Claims — General Background

In 1855, Congress established the United States Court of Claims to adjudicate private claims against the United States government.  While some Indian tribes filed claims in the newly created court, "[n]one had come to judgment by 1863 when Congress passed an amendatory law to the Court's enabling act of 1855 which, among other things, expressly excluded the Indian from the new court."  Indian Claims Commission, *Final Report* 1 (Sept. 1, 1978), *available at* https://narf.org/nill/ documents/icc_final_report.pdf [hereinafter "*Final Report*"]; *see* Act of March 3, 1863, Pub. L. No. 37-92, §9, 12 Stat. 765 (1863).  In 1881, Congress finally permitted Indian tribes to bring suit in the Court of Claims but "*only* by the process of a special jurisdictional act of Congress to open this Court to the petitioning tribes."  *Final Report* at 2 (emphasis in original).  Even so, "[t]he process of securing a jurisdictional act from Congress to grant access to the Court of Claims was an arduous one," and, by 1946, only twenty-nine out of two hundred claims that Indian Tribes had filed had received awards.  *Id.* at 2–3.  That year was a turning point for Indian tribes with Congress passing the ICCA, which also created the Indian Tucker Act.

The following section briefly summarizes the history of the ICCA and the Indian Tucker Act, provides a broad overview the breach of fiduciary duty claims that Indian Tribes now often bring before this Court, and discusses applicable statute of limitations provisions.

### A.   The Indian Claims Commission Act And Indian Tucker Act

"The United States, as sovereign, is immune from suit save as it consents to be sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."  *United States v. Sherwood*, 312 U.S. 584, 586 (1941). "Until the passage of the Indian Claims Commission Act in 1946 [], tribes could not litigate claims against the United States without specific Congressional permission." *Shoshone Indian Tribe*, 364 F.3d at 1343.  As noted *supra*, Congress, in 1946, passed the ICCA, which provided:

> The Commission shall receive claims for a period of five years after [August 13, 1946], and no claim existing before that date but not presented within such period may thereafter be submitted to any court or administrative agency for

consideration, nor will such claim thereafter be entertained by Congress.

ICCA § 12.  The ICCA thus "provided a five-year window of time during which tribes could submit to the Indian Claims Commission all of their claims against the Government that accrued before August 13, 1946." *Shoshone Indian Tribe*, 364 F.3d at 1343.  "Indian claims existing on August 13, 1946 had to be filed by August 13, 1951 or be barred forever." *W. Shoshone Nat. Council v. United States*, 279 F. App'x 980, 982 (Fed. Cir. 2008).  "The 'chief purpose of the [ICCA was] to dispose of the Indian claims problem with finality.'" *United States v. Dann,* 470 U.S. 39, 45 (1985) (quoting H.R. Rep. No. 1466, 79th Cong., 1st Sess., 10 (1945)).

The ICCA further provided that the Court of Claims, this Court's predecessor, would have jurisdiction to decide "any [Indian] claim against the United States accruing after the date of the approval of this Act."  ICCA § 24.  Section 24 of the ICCA, codified at 28 U.S.C. § 1505, is known as the Indian Tucker Act.[9]  That statute, as amended, now provides:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.

28 U.S.C. § 1505.  "By enacting this statute, Congress plainly intended to give tribal claimants the same access to the Court of Claims provided to individuals by the Tucker Act." *United States v. Mitchell*, 445 U.S. 535, 539 (1980) ("*Mitchell I*").  "It follows that 28 U.S.C. § 1505 no more confers a substantive right against the United States to recover money damages than does 28 U.S.C. § 1491." *Id.* at 540.  "To state a claim cognizable under the Indian Tucker Act, *Mitchell I* and *Mitchell II* thus instruct, a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) ("*Navajo I*").  That allegation, in turn, must meet the pleading standards as set forth in relevant United States Supreme Court

---

[9] *See United States v. Mitchell*, 463 U.S. 206, 211–12 (1983) ("*Mitchell II*") (noting that the Tucker Act's "counterpart for claims brought by Indian tribes . . . [is] known as the Indian Tucker Act").

and United States Court of Appeals for the Federal Circuit precedent.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

B.      **Breach Of Fiduciary Duty Claims**

At common law, a trust "is a fiduciary relationship with respect to property, arising from a manifestation of intention to create that relationship and subjecting the person who holds title to the property to duties to deal with it for the benefit of charity or for one or more persons, at least one of whom is not the sole trustee."  Restatement (Third) of Trusts § 2 (2003).  Based upon the aggregation of the various statutes and regulations implicated in *Mitchell II*, the Supreme Court held that the government had fiduciary obligations to Indians based upon the government's "full responsibility" for the management of Indian resources.  *Mitchell II*, 463 U.S. at 224; *see United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474 (2003) (discussing government's "'pervasive'" role in timber sales from Indian lands in *Mitchell II*, under regulations addressing "'virtually every aspect of forest management,'" and explaining that *Mitchell II* held that the relevant statutes and regulations in that case "'define[d] . . . contours of the United States' fiduciary responsibilities' beyond the 'bare' or minimal level, and thus could 'fairly be interpreted as mandating compensation' through money damages if the Government faltered in its responsibility" (quoting *Mitchell II*, 463 U.S. at 224–226)).

The government's fiduciary obligations to the Indians necessarily arose by virtue of the government's near-total control over the subject Indian property.  *Mitchell II*, 463 U.S. at 225.  Because the statutory and regulatory duties at issue in *Mitchell II* created fiduciary obligations, those statutes and regulations could be fairly interpreted as requiring the payment of money damages in the event of their breach, *id.* at 226, thus vesting this Court with jurisdiction over such claims.  *Id.* at 228; *see White Mountain Apache Tribe*, 537 U.S. at 473–74  (explaining that, in *Mitchell II*, "statutes and regulations specifically addressing the management of timber on allotted lands raised the fair implication that the substantive obligations imposed on the United States by those statutes and regulations were enforceable by damages").

Consistent with basic Tucker Act principles, however, a plaintiff's "claims must be based on a separate source of law that allows recovery of money damages" and not just on common law trust principles.  *Cloud v. United States*, 763 F. App'x 919, 920 (Fed. Cir. 2019) (citing *Mitchell II*, 463 U.S. at 216–17, and *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 173–74 (2011), and holding that "any trust obligations between the Government and Native Americans are governed by statute or regulation rather than common law").

Our appellate court — the United States Court of Appeals for the Federal Circuit — thus has recognized the Supreme Court's "establish[ment] [of] a two-part test for determining jurisdiction under the Indian Tucker Act."  *Hopi Tribe v. United States*, 782

F.3d 662, 667 (Fed. Cir. 2015).  First, a claimant "'must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'"  *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) ("*Navajo II*") (quoting *Navajo I*, 537 U.S. at 506).  Second, "[i]f that threshold is passed, the court must then determine whether the substantive source of law can be fairly interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s]." *Id.* at 290–91 (alterations in original) (internal quotation marks omitted).  "At the first step, a statute or regulation that recites a general trust relationship between the United States and the Indian People is not enough to establish any particular trust duty."  *Hopi Tribe*, 782 F.3d at 667 (citing *Mitchell I*, 445 U.S. at 542–44).  "Accordingly, the United States is only subject to those fiduciary duties that it specifically accepts by statute or regulation."  *Id.* (citing *Navajo I*, 537 U.S. at 506 ("[T]he analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions.")).[10]

On the other hand, the Federal Circuit — again, relying upon Supreme Court precedent — has rejected "the proposition that in every case 'express trust plus actual government control equals enforceable trust duties' according to common-law principles."  *Hopi Tribe*, 782 F.3d at 668 (quoting *El Paso Nat. Gas Co. v. United States,* 750 F.3d 863, 896 (D.C. Cir. 2014)).  Rather, "[t]he Supreme Court used common-law trust principles in a more limited fashion" where "statutory language evoked them, by combining trust language and authorization to use the land in the same provision."  *Id.* (explaining that "[t]he Supreme Court thus inferred that Congress intended to accept the common-law duty of a trustee to preserve the land that it actually administers" and citing *White Mountain Apache Tribe,* 537 U.S. at 475).  But, "[a]s the Supreme Court's subsequent decisions make clear, common-law trust duties standing alone, including those premised on control, are not enough to establish a particular fiduciary duty of the United States."  *Id.*; *Navajo II*, 556 U.S. at 302 ("Because the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated . . . .[,] neither the Government's 'control' over [trust assets] nor common-law trust principles matter."); *Jicarilla*, 564 U.S. at 177 ("The government assumes Indian

---

[10] For example, in *White Mountain Apache Tribe,* 537 U.S. at 475, the Supreme Court inferred that Congress accepted a fiduciary duty to preserve improvements to Indian land that the government actually used.  A statute provided that the land in question would be "held by the United States in trust" and authorized the United States to use the land exclusively.  *Id.* at 469. "This combination evoked the 'commonsense assumption,' confirmed by principles of trust law, that 'a fiduciary actually administering trust property may not allow it to fall into ruin on his watch.'"  *Hopi Tribe*, 782 F.3d at 668 (quoting *White Mountain Apache Tribe*, 537 U.S. at 475). "Thus, by using trust language in conjunction with an authorization of plenary control of the land, Congress clearly accepted a fiduciary duty to exercise that authority with the care charged to a trustee at common law."  *Id.*

trust responsibilities only to the extent it expressly accepts those responsibilities by statute.").

In the second step of the jurisdictional analysis, common-law trust principles are applicable. *Hopi Tribe*, 782 F.3d at 668. If the Indian tribe identifies a specific duty, and that duty "'bears the hallmarks of a conventional fiduciary relationship . . . *then* trust principles (including any such principles premised on control) could play a role in inferring that the trust obligation [is] enforceable by damages.'" *Id.* (quoting *Navajo II*, 556 U.S. at 301) (internal quotations omitted) (alteration in original)). That is presumably what the Supreme Court meant when it held that "when a statute establishes specific fiduciary obligations, 'it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.'" *Hopi Tribe*, 782 F.3d at 668 (quoting *Mitchell II*, 463 U.S. at 226); *see Confederated Tribes of Warm Springs Rsrv. of Or. v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001) ("Under trust law generally, a beneficiary is entitled to recover damages for the improper management of the trust's investment assets.").[11]

## C.   Statute Of Limitations Principles:  Claim Accrual, Tolling, And Suspension

The applicable statute of limitations provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. "The 6–year statute of limitations on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988) (citing cases). In that regard, "statutes of limitations are to be applied against the claims of Indian tribes in the same manner as against any other litigant seeking legal redress or relief from the government." *Id.* at 1576 (citing *United States v. Mottaz*, 476 U.S. 834 (1986); *Capoeman v. United States*, 440 F.2d 1002, 1007–08 (Ct. Cl. 1971)).

When does a plaintiff's claim "first accrue"? In general, a "claim 'first accrues' when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Id.* at 1577 (citing *Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States*, 373 F.2d 356, 358 (Ct. Cl. 1967), *cert. denied*, 389 U.S. 971 (1967)); *see Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1570 (Fed. Cir. 1993) (describing as "hornbook law" the principle "that a claim does not accrue until all events necessary to fix the liability of the defendant have occurred—

---

[11] Although the parties dispute whether various statutes and regulations at issue in this case create money-mandating trust duties, *see, e.g.*, Def. Mot. at 21; Pl. Resp. at 36, the Court, with but one exception, assumes (without deciding), for the purposes of resolving the government's motion, that the Tribe is correct.

when 'the plaintiff has a legal right to maintain his or her action'" (quoting Corman, *Limitation of Actions*, § 6.1, p. 374 (1991))).  The Federal Circuit has clarified, however, that "for the purposes of section 2501, it would appear more accurate to state that a cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence."  *Hopland Band of Pomo Indians*, 855 F.2d at 1577  (emphasis in original) (citing *Kinsey v. United States,* 852 F.2d 556, 557 n. * (Fed. Cir. 1988)); *see Nager Electric Co. v. United States*, 368 F.2d 847, 851 (Ct. Cl. 1966) ("'First accrual' has usually been put, in broad formulation, as the time when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.").

For breach of trust claims, the Federal Circuit has recognized two different accrual rules.  "The general rule is that the statute of limitations 'does not run against a beneficiary in favor of a trustee until the trust is repudiated and the fiduciary relationship is terminated.'" *Hopland Band of Pomo Indians*, 855 F.2d at 1578 (quoting *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238, 1249 (N.D. Cal. 1973)).  While that rule applies to claims for recovery of a trust corpus, it is "not applicable to claims for misfeasance or nonfeasance." *Id.* (discussing *Jones v. United States,* 9 Cl. Ct. 292, 295 (1985), *aff'd on other grounds*, 801 F.2d 1334 (Fed. Cir. 1986), *cert. denied*, 481 U.S. 1013 (1987)); *see Cherokee Nation of Oklahoma v. United States*, 21 Cl. Ct. 565, 571–72 (1990) (citing *Menominee Tribe of Indians v. United States,* 726 F.2d 718, 721–22 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 826 (1984), and holding that where "allegations involve misfeasance or nonfeasance, the existence of a trust relationship does not act to toll the statute of limitations").[12]  Even where the general rule governs, however, "[a] trustee may repudiate an express trust by words or . . . by actions inconsistent with his obligations under the trust."  *Jones v. United States*, 801 F.2d 1334, 1336 (Fed. Cir. 1986) (citing *Philippi v. Philippe,* 115 U.S. 151, 157 (1984), and G. Bogert & G. Bogert, *The Law of Trusts and Trustees* § 951 (rev. 2d ed. 1982)).[13]

The Federal Circuit further has distinguished between two types of "tolling":

> [T]he distinction that must be drawn is that between tolling the commencement of the running of the statute (a tolling of the accrual) and tolling the running of the statute once commenced (a tolling of the statute).  In suits against the

---

[12] *Catawba Indian Tribe of S.C. v. United States*, 24 Cl. Ct. 24, 31 (1991) ("While plaintiff has repeatedly alleged Government nonfeasance, nonfeasance by a trustee, as distinguished from repudiation of the trust by the trustee, does not present an exception to tolling."), *aff'd*, 982 F.2d 1564 (Fed. Cir. 1993).

[13] *Shoshone Indian Tribe of Wind River Rsrv., Wyo.*, 672 F.3d at 1030–31 (discussing claim accrual rules in Indian Tucker Act cases and for breach of trust actions, in particular).

> government brought under section 2501, the distinction can
> be critical because the former routinely is allowed while the
> latter rarely is.

*Hopland Band of Pomo Indians*, 855 F.2d at 1578; *see also Shoshone Indian Tribe of Wind River Rsrv., Wyo.*, 672 F.3d at 1031 n.6 (quoting *Hopland Band of Pomo Indians*, 855 F.2d at 1578).

Where the facts giving rise to a cause of action were known to a plaintiff more than six years prior to the filing of a suit, but the law was not clear until later, the Federal Circuit has rejected tolling to delay a claim's accrual. *Catawba Indian Tribe*, 982 F.2d at 1572 ("[A]ll the relevant *facts* were known. It was the meaning of the law that was misunderstood." (emphasis in original)).[14]  Moreover, the Federal Circuit has "'soundly rejected' the contention 'that the filing of a lawsuit can be postponed until the full extent of the damage is known.'" *Navajo Nation v. United States*, 631 F.3d 1268, 1277 (Fed. Cir. 2011) (quoting *Boling v. United States,* 220 F.3d 1365, 1371 (Fed. Cir. 2000)); *Shoshone Indian Tribe of Wind River Rsrv., Wyo.*, 672 F.3d at 1032–33 ("The [government's] failure to follow the notice, advertisement, and competitive bidding requirements of the 1938 Act when the conversions occurred was the harm suffered by the Tribes; the economic consequences of the new leases may define the scope of that harm, but they are not the event that triggers the statute of limitations.").

In this case, several statutory provisions potentially impact when the Tribe's claims accrued so as to preclude the application of the statute of limitations to bar the Tribe's claims. *See Shoshone Indian Tribe*, 364 F.3d at 1346. (explaining that "[s]tatutes that toll the statute of limitations, resurrect an untimely claim, defer the accrual of a cause of action, or otherwise affect the time during which a claimant may sue the Government also are considered a waiver of sovereign immunity"). For example, in a series of provisions enacted as part of the United States Department of the Interior's annual appropriations,[15] Congress provided:

> [N]otwithstanding any other provision of law, the statute of
> limitations shall not commence to run on any claim, including
> any claim in litigation pending on the date of the enactment
> of this Act, concerning losses to or mismanagement of trust

---

[14] "It is settled law . . . that § 2501 'is not tolled by the Indians' ignorance of their *legal* rights.'" *Shoshone Indian Tribe of Wind River Rsrv., Wyo.*, 672 F.3d at 1031 (quoting *Menominee Tribe,* 726 F.2d at 720–21); *id.* at 1032  ("As explained in both *Menominee* [*Tribe*] and *Catawba* [*Indian Tribe*], a trust beneficiary's subjective ignorance of the law giving rise to its claim, even if predicated on misleading statements relating to those legal rights, does not toll the accrual of the statute of limitations." (citing *Menominee Tribe,* 726 F.2d at 720–21, and *Catawba Indian Tribe,* 982 F.2d at 1570–71)).

[15] These statutory provisions have been referred to as the Indian Trust Accounting Statute ("ITAS"). *Simmons v. United States*, 71 Fed. Cl. 188, 193 (2006); Def. Mot. at 19; Pl. Resp. at 22.

> funds, until the affected Indian tribe or individual Indian has
> been furnished with an accounting of such funds from which
> the beneficiary can determine whether there has been a loss[.]

Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat 5, 305 (Jan. 17, 2014).[16]  Reviewing the "the plain language of the Act," the Federal Circuit held that "Congress has expressly waived its sovereign immunity and deferred the accrual of the Tribes' cause of action until an accounting is provided." *Shoshone Indian Tribe*, 364 F.3d at 1346–47 (explaining that "[t]he introductory phrase '[n]otwithstanding any other provision of law' connotes a legislative intent to displace any other provision of law that is contrary to the Act, including 28 U.S.C. § 2501" while "[t]he next important phrase of

---

[16] Congress also enacted this (or nearly identical) language in 1993–1994, 1996–2001, 2003–2005, 2007, 2009, and 2011.  Department of the Interior and Related Agencies Appropriations Act, 1994, Pub. L. No. 103-138, 107 Stat. 1379 (Nov. 11, 1993); Department of the Interior and Related Agencies Appropriations Act, 1995, Pub. L. No. 103-332, 108 Stat. 2499 (Sept. 30, 1994); Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (Apr. 26, 1996); Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996); Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-83, 111 Stat. 1543 (Nov. 14, 1997); Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, 112 Stat. 2681 (Oct. 21, 1998); Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, 113 Stat. 1501 (Nov. 29, 1999); Department of the Interior and Related Agencies Appropriations Act, 2001, Pub. L. No. 106-291, 114 Stat. 922 (Oct. 11, 2000); Consolidated Appropriations Resolution, 2003, Pub. L. No. 108–7, 117 Stat. 11, 236 (Feb. 20, 2003); Department of the Interior and Related Agencies Appropriations Act, 2004, Pub. L. No. 108–108, 117 Stat. 1241, 1263 (Nov. 10, 2003); Consolidated Appropriations Act, 2005, Pub. L. No. 108–447, 118 Stat. 2809, 3060–61 (Dec. 8, 2004); Department of the Interior, Environment, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109–54, 119 Stat. 499, 519 (Aug. 2, 2005); Consolidated Appropriations Act, 2008, Pub. L. No. 110–161, 121 Stat. 1844, 2115 (Dec. 26, 2007); Omnibus Appropriations Act, 2009, Pub. L. No. 111–8, 123 Stat. 524, 718–19 (Mar. 11, 2009); Department of the Interior—Appropriation, 2010, Pub. L. No. 111–88, 123 Stat. 2904, 2922 (Oct. 30, 2009); Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat. 786 (Dec. 23, 2011); *see also Round Valley Indian Tribes v. United States*, 97 Fed. Cl. 500, 506 n.6 (2011).  Previous versions of this provision omitted the phrase "including any claim in litigation pending on the date of the enactment of this Act" and/or the phrase "from which the beneficiary can determine whether there has been a loss."  *See* Department of the Interior and Related Agencies Appropriations Act, 1991, Pub. L. No. 101-512, 104 Stat. 1915 (Nov. 5, 1990) ("notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with the accounting of such funds").  Congress enacted such earlier versions in 1990–1992.  *Id.*; Department of the Interior and Related Agencies Appropriations Act, 1992, Pub. L. No. 102-154, 105 Stat. 990 (Nov. 13, 1991); Department of the Interior and Related Agencies Appropriations Act, 1993, Pub. L. No. 102-381, 106 Stat. 1374 (Oct. 5, 1992); *see also Wolfchild v. United States*, 731 F.3d 1280, 1290 (Fed. Cir. 2013) (noting that "[t]he ITAS . . . has been included in appropriations acts since 1990").

the Act, 'shall not commence to run,' unambiguously delays the commencement of the limitations period until an accounting has been completed that reveals whether a loss has been suffered").

Accordingly, "[t]he clear intent of the Act is that the statute of limitations will not begin to run on a tribe's claims until an accounting is completed." *Shoshone Indian Tribe*, 364 F.3d at 1347.[17]  In particular, according to the Federal Circuit, "the Act provides that claims falling within its ambit shall not accrue, i.e., 'shall not commence to run,' until the claimant is provided with a ***meaningful*** accounting." *Id.* (emphasis added) (commenting "[t]his is simple logic—how can a beneficiary be aware of any claims unless and until an accounting has been rendered?"); *see also Oenga v. United States*, 83 Fed. Cl. 594, 609 (2008) ("For 'claims falling within [the] ambit' of the ITAS, therefore, the statute of limitations does not begin to run—meaning the claims do not accrue— until the plaintiffs receive a meaningful accounting." (quoting *Shoshone Indian Tribe,* 364 F.3d at 1347) (alteration in original)).

Several of this Court's decisions appear to have read the Federal Circuit's interpretation of the ITAS provisions as reflecting a heightened standard for triggering the start of the statute of limitations clock.  *See, e.g., Osage Tribe of Indians of Okla. v. United States*, 68 Fed. Cl. 322, 334 (2005) ("Whether the plaintiff knew or should have known of the alleged failures to enforce the contractual obligations of lessees is not the pertinent issue, according to the Federal Circuit's analysis in *Shoshone* [*Indian Tribe*, 364 F.3d 1339]. . . . The Appropriations Act requires more than simply a suspicion of malfeasance to commence the running of the statute of limitations."); *Chippewa Cree Tribe of the Rocky Boy's Rsrv. v. United States*, 69 Fed. Cl. 639, 664 (2006) ("The Federal Circuit construed the Appropriations Acts enacted in 1991 and subsequent years to require that a meaningful accounting be completed and provided to the beneficiary that will allow the beneficiary to determine whether any losses to or mismanagement of trust funds have occurred.  The Federal Circuit specifically distinguished the 'meaningful accounting' standard from the simple notice standard advanced by defendant . . . ." (internal citation omitted)); *Oenga*, 83 Fed. Cl. at 609 n.48 ("[T]he 'meaningful accounting' standard has been found to require more than simple notice, in that the information in the accounting must be sufficient to raise suspicion of possible losses.  Accordingly, the ITAS comports with the 'lesser duty to discover malfeasance' on the part of trust beneficiaries." (quoting *Shoshone Indian Tribe*, 364 F.3d at 1347) (internal citation omitted)).[18]

---

[17] *Simmons*, 71 Fed. Cl. at 193 ("The Federal Circuit has held that the [ITAS] 'displaces' Section 2501 and can resurrect otherwise barred claims." (quoting *Shoshone Indian Tribe*, 364 F.3d at 1345–48)).

[18] *Chippewa Cree Tribe of the Rocky Boy's Rsrv.*, 69 Fed. Cl. at 664 ("The *Shoshone* [*Indian Tribe*] opinion underscored the dependence that a trust beneficiary has on the proper conduct and expertise of the trustee, concluding that 'because of this reliance, beneficiaries are under a lesser

On the other hand, the Federal Circuit itself does not appear to have viewed the ITAS accrual-tolling statutory language as inconsistent with the general claim accrual principles applicable to Indian breach of trust claims outlined *supra*. *Shoshone Indian Tribe*, 364 F.3d at 1347–48 ("The interpretation of the Act provided by this court also comports with fundamental trust law principles. . . . It is therefore common for the statute of limitations to not commence to run against the beneficiaries until a final accounting has occurred that establishes the deficit of the trust.").

The ITAS accrual-tolling language "covers any claims that allege the Government mismanaged funds after they were collected, as well as any claims that allege the Government failed to timely collect amounts due and owing to the Tribes[.]" *Id.* at 1351; *see also Oenga*, 83 Fed. Cl. at 609–10. The ITAS language, however, does not cover mineral (or other similar) trust assets themselves. *Shoshone Indian Tribe,* 364 F.3d at 1350 ("While it is true that a failure to obtain a maximum benefit from a mineral asset is an example of an action that will result in a loss to the trust, the Act's language does not on its face apply to claims involving trust *assets.*" (emphasis in original)); *see also Simmons*, 71 Fed. Cl. at 193 ("[T]he Court is bound by the determination that the ITAS does not apply to this case. Because none of the Plaintiff's claims accrued within six years and there is no ground to toll or displace the running of Section 2501, the Court must conclude that this complaint is time barred.").[19]

## IV.     The Tribe's Complaint Must Be Dismissed Pursuant To RCFC 12(b)(1) And RCFC 12(b)(6) For Lack Of Jurisdiction And For Failure To State A Claim

In general, there are only a few possibilities here:

1)   The Tribe does not know whether the government has breached its fiduciary duties, or is otherwise liable to the Tribe for money damages;

2)   The Tribe has alleged facts, which, if proven,[20] demonstrate that the government has breached its fiduciary duties, or is otherwise liable to the Tribe for money damages, *but the Tribe does **not** know the quantum of such damages*; **and/or**

---

duty to discover malfeasance relating to their trust assets.'" (quoting *Shoshone Indian Tribe,* 364 F.3d at 1347 (citations omitted))).

[19] The Federal Circuit rejected the trial court's view that the ITAS could be extended to "claims that the Government did not receive the best possible price for the leases negotiated," reasoning that, "[w]hile it is true that a failure to obtain a maximum benefit from a mineral asset is an example of an action that will result in a loss to the trust, the [ITAS] language does not on its face apply to claims involving trust assets." *Shoshone Indian Tribe*, 364 F.3d at 1349–50.

[20] For the purposes of resolving the government's motion to dismiss for failure to state a claim, the Court assumes the Tribe's allegations in its Complaint are true. *See supra* note 5.

3) The Tribe has alleged facts, which, if proven, demonstrate that the government is liable to the Tribe, *and* the Tribe *does* know enough to allege a quantum of damages.

If the Tribe's Complaint — or any of the claims contained therein — are analogous to the first scenario *supra*, the Tribe has not stated a claim as a matter of law. To avoid dismissal under RCFC 12(b)(6) for failure to state a claim, "'a complaint must allege facts plausibly suggesting (not merely consistent with) a showing of entitlement to relief.'" *Matthews v. United States*, 750 F.3d 1320, 1322 (Fed. Cir. 2014) (quoting *Kam–Almaz v. United States*, 682 F.3d 1364, 1367 (Fed. Cir. 2012) (internal quotations omitted)); *see also Todd Const., L.P. v. United States*, 656 F.3d 1306, 1316–17 (Fed. Cir. 2011); *Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anonima*, 339 F. Supp. 3d 169, 181 (S.D.N.Y. 2018) ("equivocal allegations are insufficient to state a claim"); *Inter-Tribal Council of Ariz., Inc. v. United States*, 125 Fed. Cl. 493, 502 (2016) (holding Indian Tucker Act "complaint fails to 'allege facts plausibly suggesting (not merely consistent with) a showing of entitlement to relief'" (quoting *Matthews*, 750 F.3d at 1322 (citation omitted))); *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" (quoting *Twombly*, 550 U.S. at 557 (brackets omitted in original))).

The Tribe cannot survive a motion to dismiss by pointing to mere conclusory allegations of law or by alleging that the government *may* have breached its trust duties.[21]  Thus, there is a difference between, on the one hand, alleging facts demonstrating that the government in fact *did* breach its trust duties, thereby causing injury to the Tribe — and obtaining discovery to prove that case — and the Tribe's

---

[21] *See* Compl. ¶¶ 73(a)–(q) (listing legal conclusions and admitting that the Tribe is unable "to determine **whether**, and to what extent, it has suffered a loss" (emphasis added)); 91 ("The Tribe is further entitled to recover damages for **any and all** mismanagement by the Federal Government of the Parker Dam Compensation Monies." (emphasis added)); 97 ("The Tribe is further entitled to recover damages for **any and all** mismanagement by the Federal Government of the ICC Judgment Funds, including **any and all** such mismanagement disclosed by any accounting ordered by the Court." (emphasis added)); 118(a)–(i) (listing legal conclusions); 129(a)–(e) (same); 130 ("The Tribe is further entitled to request an accounting of and to recover compensation and damages for **any and all** takings and/or mismanagement of the Tribe's shoreline lands and related assets, improvements, and riparian rights, from 1946 until the present." (emphasis added)); 137 ("[T]he Tribe is entitled to an accounting of and to recover compensation and damages for **any and all** mismanagement of the Tribe's BIA suspense and/or special deposit accounts that were maintained from time to time for the Tribe by the BIA during the time period from 1946 until the present."  (emphasis added)).  None of the foregoing statements are factual allegations demonstrating the Tribe's entitlement to money damages. Instead, they are the type of statements that are insufficient to state a claim under *Twombly* 550 U.S. at 557 and *Iqbal*, 556 U.S. at 678.

merely asserting that it *does not know whether* it has been injured, and requiring discovery to learn whether it has a claim at all.[22]  In the latter case, the Tribe cannot proceed before this Court, but may be able to seek an accounting from the district court and, depending upon the results of that action, then proceed in a case before this Court, perhaps without having to worry about the statute of limitations.  That is because, in the absence of the government's having provided the Tribe with a meaningful accounting, the ITAS tolling provision may protect the Tribe from (at least some of) its claims being barred by the statute of limitations.  The Supreme Court has recognized this sequence of actions as proper.  *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 316–17 (2011) ("It also seems likely that Indian tribes in the Nation's position could go to district court first without losing the chance to later file in the CFC, for Congress has provided in every appropriations Act for the Department of the Interior since 1990 that the statute of limitations on Indian trust mismanagement claims shall not run until the affected tribe has been given an appropriate accounting.").  But, as demonstrated *infra* — and as the Tribe acknowledged[23] — it cannot obtain an accounting from this Court for the purposes of obtaining facts prior to stating a claim (or in order to state claim) within this Court's jurisdiction.

If the second or third scenarios *supra* describe the Complaint (or its claims) at issue, the Tribe, by definition, can state a claim as a matter of law, but there is a corollary to that axiom:  having a ripe claim necessarily means that it accrued prior to the filing of the Complaint.  If so, the question for the Court is how long ago did the claim accrue, thereby triggering the running of the statute of limitations?  If the answer is "more than six years ago," the claim presumptively is barred.  The only caveat to that rule is that certain claims[24] will not have accrued, and the statute of limitations will not have begun to run, unless the government had provided the Tribe with a "meaningful

---

[22] *Beaulieu v. Bd. of Trustees of Univ. of W. Fla.*, 2007 WL 9734887, at *6 (N.D. Fla. Nov. 7, 2007) ("Plaintiff's allegations, all predicated on the use of the word 'may,' are clearly speculative, and they are unsupported by any facts . . ."); *Dunbar v. Wells Fargo Bank, N.A.*, 853 F. Supp. 2d 839, 848 (D. Minn. 2012) ("Mere speculation about what may have happened does not allow a plausible inference . . ."), *aff'd*, 709 F.3d 1254 (8th Cir. 2013); *Bednar v. Pierce & Assocs., P.C.*, 220 F. Supp. 3d 860, 866–67 (N.D. Ill. 2016) ("Plaintiff uses the word 'may' because he has not made any allegation that the judgment was in fact reported, much less any allegation of calculable harm flowing from such reporting.  The alleged injury thus falls short of the calculable, measured loss that Plaintiff must plead[.]").

[23] *See* Pl. Supp. Br. at 3 (conceding that "this Court lacks jurisdiction to order the Government to perform an accounting").

[24] *See Wolfchild*, 731 F.3d at 1291 (explaining that the ITAS tolling provisions only apply to claims that involve "trust funds," i.e., funds that are "subject to a trust duty"); *Shoshone Indian Tribe*, 364 F.3d at 1350 ("While it is true that a failure to obtain a maximum benefit from a mineral asset is an example of an action that will result in a loss to the trust, the Act's language does not on its face apply to claims involving trust *assets*."  (emphasis in original)).

accounting"[25] — *i.e.*, one "from which the beneficiary [Tribe] can determine **whether there has been a loss**." *Wolfchild*, 731 F.3d at 1291 (quoting Pub. L. No. 108–108, 117 Stat. 1241, 1263 (2003)) (emphasis added); *see supra* note 16.  The key point is in the emphasized statutory phrase:  a claim's accrual — at least with respect to trust funds — is **not** dependent upon the Tribe's ability to calculate a precise damages sum.  Put differently, a claim accrues whenever the Tribe has been placed on notice of "**_a_** loss" — not the precise quantum of loss.  *Wolfchild*, 731 F.3d at 1291 (quoting Pub. L. No. 108–108, 117 Stat. 1241, 1263 (2003) (emphasis added).  But if the Tribe is on notice of a breach of the government's trust obligations sufficient to state a claim — and simply is uncertain of the quantum of damages[26] — the claim already has accrued and the statute of limitations has begun to run.[27]

The Tribe has placed itself between a rock and a hard place, insofar as the Complaint toils not to commit to any of the scenarios outlined *supra*.[28]  On the one

---

[25] *Wolfchild*, 731 F.3d at 1291.

[26] To calculate damages, the Tribe may pursue discovery or, if the Tribe ultimately succeeds on the merits, obtain an accounting.

[27] That is why the Federal Circuit held that the ITAS provisions are consistent with claim accrual law for breach of trust claims.  *Id.*  ("When a claim concerns an open repudiation of an alleged trust duty, 'a final accounting [i]s unnecessary to put the [claimants] on notice of the accrual of [their] claim.'" (quoting *San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1355 (Fed. Cir. 2011) (internal quotation omitted))).

[28] Consider this self-defeating allegation:

> To date, the Federal Government has failed to provide that accounting or other sufficient information, that would afford the Tribe the ability to determine *whether*, and to what extent, it has suffered a loss as a result of the Federal Government's breaches of its fiduciary duties and obligations.  The Tribe is, therefore, *uncertain of the exact amount* of damages it has sustained as a result of the Federal Government's breach of its fiduciary duty as alleged in this complaint[.]

Compl. ¶ 73(q) (emphasis added).  So, which is it?  Is the Tribe unable even "to determine *whether* . . . it has suffered a loss" due to the government's alleged breach of fiduciary duties?  If so, the Tribe has no claim.  Or is the Tribe merely "*uncertain* of the exact amount of damages"?  In that case, the Tribe can state a claim, but then must answer difficult questions about when such claim(s) accrued and whether they may be barred by the statute of limitations.  *See* Def. Mot. at 20 (correctly observing that "[o]ne can reasonably infer from this statement that Plaintiff knows of *some estimate of* damage from the public and known events that underlie its claims").  In that regard, this Court has "'soundly rejected' the contention 'that the filing of a lawsuit can be postponed until the full extent of the damage is known.'"  *Navajo Nation*, 631 F.3d at 1277 (quoting *Boling*, 220 F.3d at 1371).  In either case, the Tribe's "vague and contradictory" allegations in this case present an unsurmountable hurdle.  *Day v. Nakamura*, 59 F.3d 164, *2 (1st Cir. 1995) (unpublished table opinion) (failure to state a claim); *Jackson v. Conner Collins, Inc.*,

hand, as demonstrated *infra* (*see* Section IV.B.), the counts of the Tribe's Complaint focused on alleged trust fund mismanagement entirely fail to recite anything more than legal conclusions, and thus must be dismissed pursuant to RCFC 12(b)(6).  On the other hand, to the extent the Complaint recites factual allegations, there is not one set of them that could not have been alleged long ago, at the very latest when the Tribe received the 1996 Arthur Andersen Report.[29]  Indeed, the government is correct:  "[t]he only dates or time periods identified by Plaintiff for the United States' alleged breaches of trust duties are from the last century."  Def. Mot. at 20.  Put differently, to the extent the Tribe complains that it lacks sufficient facts — and that the 1996 Arthur Andersen Report does not constitute a "meaningful accounting" — the Tribe's remedy lies in district court (assuming the Tribe still has a timely claim there).  And, to the extent the Tribe maintains that its Complaint *does* contain sufficient facts, the Tribe implicitly admits that it was on notice at least since the 1996 Arthur Andersen Report, in which case the statute of limitations bars Plaintiff's claims.  Either way, the Tribe's Complaint must be dismissed.

The Tribe appears to recognize its dilemma, at one point employing different tenses in the same sentence, in what appears to be a deliberate attempt to muddy the waters.  For example, the Tribe alleges that its "breach-of-fiduciary duty claims **did not, does not**, begin to 'accrue' until the following occurs . . ."  Compl. ¶ 66 (emphasis added).  One part of the sentence is in the past tense ("did not . . . begin to 'accrue'"), while the other is in the present tense and references future events (the phrase "does not[] begin to 'accrue' until" and the word "occurs").  So, which is it?  Did the claim accrue at some time in the past or has it not accrued yet at all?  In the very next paragraph of the Complaint, the Tribe surprisingly asserts that the statute of limitations "has not *yet* begun to run in this civil action" and therefore "[t]his civil action was . . . timely filed."  *Id.* ¶ 67 (emphasis added).  But if the statute of limitations has not yet begun to run, it is axiomatic that the Tribe did not have a claim.  *See Reiter v. Cooper*, 507 U.S. 258, 267 (1993) ("While it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but at another time for the purpose of bringing suit, we will not infer such an odd result in the absence of any such indication in the statute.").[30]

---

2009 WL 500858, at *1 (M.D. Ga. Feb. 27, 2009) ("Based on the lack of factual detail and the confusing, contradictory nature of the allegations in his Complaint, the Court concludes Plaintiff's Complaint fails to give Defendants fair notice of Plaintiff's claims and the grounds on which they rest.  The Complaint also lacks enough factual detail to raise a right to relief above the speculative level."); *Bonham v. Orden*, 1991 WL 229950, at *1 (D.D.C. Oct. 25, 1991) ("The contradictory allegations in plaintiff's complaint render it patently frivolous.").

[29] Or when it was deemed received by the Tribe on December 31, 2000, pursuant to statute.  Settlement of Tribal Claims—Amendment, Pub. L. No. 109-158 § 1, 119 Stat. 2954 (Dec. 30, 2005).

[30] *See also Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997) (holding that "[u]nless Congress has told us otherwise in the legislation at issue, a

Contrary to the Tribe's assertion, Compl. ¶¶ 66–67, there is no evidence that its claims accrued or that the Tribe became aware of its claims only on the date it filed its suit.

### A.     This Court Lacks Jurisdiction Over The Tribe's Complaint

#### 1.     The Tribe's Independent Claims For An Accounting Belong In District Court

There is no doubt that this Court has the power to order an accounting in support and aid of a judgment on liability in favor of a plaintiff seeking damages from the United States pursuant to the Tucker Act.  28 U.S.C. § 1491(a)(2) ("To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing . . . correction of applicable records, and such orders may be issued to any appropriate official of the United States.  In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."); *Klamath & Modoc Tribes*, 174 Ct. Cl. at 490 ("We agree with plaintiffs that the court has the power to require an accounting in aid of its jurisdiction to render a money judgment on that claim, but we disagree with plaintiffs on the applicable procedure.").  What this Court cannot do, however, is order an accounting so that the Tribe can figure out whether it has any claim at all.  *See Klamath & Modoc Tribes*, 174 Ct. Cl. at 485–88 ("It is fundamental that an action for

---

cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief" (citing *Reiter*, 507 U.S. at 267)); *Martin v. Constr. Laborer's Pension Tr. for S. Cal.*, 947 F.2d 1381, 1385, n.7 (9th Cir. 1991) (explaining that where plaintiff "argues that the statute of limitations has not begun to run on his claim[,]"  the court's "[a]cceptance of [that] argument would require dismissal of his action" because "[i]f [plaintiff's] cause of action has not accrued, then his claim is not yet ripe for review"); *Arnold ex rel. Arnold v. Sec'y of Health & Human Servs.*, 2008 WL 4054354, at *3 (Fed. Cl. Aug. 19, 2008) (holding that where petitioners "argue that their claim has not accrued (meaning the statute of limitations has not started to run)," that is contradicted by the filing of a petition, and explaining that "[i]f the [petitioners] were correct that the statute of limitations has not begun to run, then it would appear that the [petitioners] have filed their case prematurely in the sense that all the elements are not present"); *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995) ("a cause of action accrues when all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action"); *A. Stucki Co. v. Buckeye Steel Castings Co.*, 795 F. Supp. 847, 855 (S.D. Ohio 1991) ("[I]n the usual case a statute of limitations commences to run when the cause of action accrues, that is, when the plaintiff is first able to assert that cause of action, and thus it seems somewhat anomalous for plaintiff herein to bring an action . . . and at the same time argue that the applicable statute of limitations period has not begun to run."), *aff'd*, 963 F.2d 360 (Fed. Cir. 1992); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990) ("Accrual is the date on which the statute of limitations begins to run.  It is not the date on which the wrong that injures the plaintiff occurs, but the date—often the same, but sometimes later—on which the plaintiff discovers that he has been injured.").

accounting is an equitable claim and that courts of equity have original jurisdiction to compel an accounting. . . . Our general jurisdiction under the Tucker Act does not include actions in equity." (citing cases)); *Ft. Mojave Tribe v. United States*, 546 F.2d 429, 728 (Ct. Cl. 1976) ("A suit for an accounting is a suit in equity and we have no equity jurisdiction except in aid of a judgment of liability against the Government. . . . Accordingly, we have no jurisdiction over plaintiff's suit for an accounting.").

In other words, "[t]o require the Government *ab initio* to render a general accounting on the basis of unproved allegations and before its liability is determined would convert this proceeding from a suit for money damages to an independent equitable action for a general accounting." *Klamath & Modoc Tribes*, 174 Ct. Cl. at 491. Indeed, such "claims must be developed independently and not as the result of an accounting ordered by this court. Unlike the Indian Claims Commission, this court has no equity jurisdiction to entertain a suit for an accounting except in aid of a judgment of liability against the Government." *Am. Indians Residing On Maricopa-Ak Chin Rsrv. v. United States*, 667 F.2d 980, 983 (Ct. Cl. 1981).

The Tribe's "Prayer for Relief" contains a request for an award of "an accounting in aid of jurisdiction to render the compensation award and monetary judgment." Compl. at 56. The Court has no trouble with that request *per se*, provided that the Tribe can prevail on a substantive monetary claim within this Court's jurisdiction. Count V, however, is an independent claim for an accounting based on the government's alleged statutory obligations to complete an accounting, something the Tribe alleges the government has not done (or has not done adequately). Compl. ¶¶ 138–45. The Tribe nowhere contends that the statutory provisions on which it relies are themselves money-mandating or independently support Tucker Act jurisdiction. Again, as explained *supra*, the Court has no jurisdiction to order an accounting except as a means of determining the quantum of damages resulting from a successful claim over which this Court possesses jurisdiction. *Confidential Informant 59-05071 v. United States*, 134 Fed. Cl. 698, 720–21 (2017) ("The Court has power to require an accounting in connection with its jurisdiction over a money claim under the Tucker Act. . . . It does not have such authority, however, where the plaintiff is not entitled to money damages."), *aff'd*, 745 F. App'x 166 (Fed. Cir. 2018). At oral argument, the Tribe's counsel repeatedly conceded this point. Tr. at 43:9–11 ("An accounting claim is properly brought in District Court and not in this Court."); *id.* at 43:23–25 ("standing alone were the fifth cause of action the only one cited, that that would belong in District Court and not in this Court").[31]

---

[31] "'[A] lawyer's statements may constitute a binding admission of a party[ ]' if the statements are 'deliberate, clear, and unambiguous[.]'" *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014) (quoting *Fraternal Order of Police Lodge No. 89 v. Prince George's Cty., Md.*, 608 F.3d 183, 190 (4th Cir. 2010)); *see Checo v. Shinseki*, 748 F.3d 1373, 1378 n.5 (Fed. Cir. 2014)

In sum, this Court cannot order an accounting merely for the Tribe to determine whether it "has one or more additional monetary claims against the United States." Compl. ¶ 144. To the extent that the Tribe seeks a "declaration that the 199[6] Arthur Anderson [sic] Report does not meet the Federal Government's obligations[,]" *id.* ¶ 145, the Court addresses the issue as part of statute limitations question *infra*. Ultimately, however, if the Tribe has insufficient information to plead facts demonstrating the government's breach of fiduciary or trust duties, the Tribe "may seek an accounting in federal district court to identify any breach of the government's investment and accounting duties and proceed with an action if it discovers any financial impropriety" — assuming, of course, that such a cause of action would itself still be timely. *Inter-Tribal Council of Ariz.*, 125 Fed. Cl. at 505 n.16.

Accordingly, Count V's independent claim for an accounting is **DISMISSED** for lack of jurisdiction. *Confidential Informant 59-05071*, 134 Fed. Cl. at 720 (holding that "absent liability on the part of the defendant on a claim over which the Court has subject matter jurisdiction, the Court lacks jurisdiction over any independent equitable action for an accounting"), *aff'd*, 745 F. App'x 166 (Fed. Cir. 2018). Similarly, to the extent that Counts I-IV seek an accounting for the purposes of determining whether the Tribe has claims for breach of fiduciary duties, such Counts are **DISMISSED** for lack of jurisdiction.[32] In that regard, the Tribe cites no authority for the proposition that the government's failure to render a proper accounting in and of itself — assuming for the sake of argument that is the case here — may breach the government's fiduciary duties in a manner that gives rise to a claim for money damages within this Court's

---

(questioning the Veterans Court's "reluctance to accept [a] concession" made at oral argument and citing case law for the proposition that admissions are generally binding on the parties).

[32] *See* Compl. ¶ 91 (Count I) ("The Tribe is further entitled to recover damages for any and all mismanagement by the Federal Government of the Parker Dam Compensation Monies occurring on or after 1946, including any and all such mismanagement *disclosed by any accounting ordered by the Court* of the Federal Government's long-term retention and/or ultimate disbursement and/or disposition of the Parker Dam Compensation Monies." (emphasis added)); *id.* ¶ 97 (Count II) ("The Tribe is further entitled to recover damages for any and all mismanagement by the Federal Government of the ICC Judgment Funds, including any and all such mismanagement *disclosed by any accounting ordered by the Court* of the Federal Government's retention and ultimate disbursement and/or disposition of the ICC Judgment Funds." (emphasis added)); *id.* ¶ 122 (Count III) ("The Tribe is entitled to an audit and full accounting by the Government of the total amount or amounts of 'surplus' water rights of the Tribe that have been expropriated and given free of charge to the MWD and other junior users since the final adjudication of the Tribe's quantified water rights in *Arizona v. California*, in 1964."); *id.* ¶ 137 (Count V) ("Accordingly, the Tribe is entitled to an accounting of and to recover compensation and damages for any and all mismanagement of the Tribe's BIA suspense and/or special deposit accounts that were maintained from time to time for the Tribe by the BIA during the time period from 1946 until the present.").

jurisdiction.[33]  *Rosebud Sioux Tribe v. United States*, 102 Fed. Cl. 429, 436 (2011) (explaining that "the accounting sought in the district court suit (required incident to fiduciary responsibilities as well as by statute) may be a predicate for at least proof of damages or identification of additional breaches in the CFC action"); *Muscogee (Creek) Nation of Okla. v. United States*, 103 Fed. Cl. 210, 218 (2011) (distinguishing, in the context of addressing a motion to dismiss pursuant to 28 U.S.C. § 1500, "a request for an accounting (or a better accounting)" — which belongs in district court — from a claim seeking "a determination of compensatory damages[,]" where jurisdiction is proper in the Court of Federal Claims).

### 2.    The Tribe's Claims Are Barred By The Statute Of Limitations

Plaintiff filed its initial complaint on April 20, 2016.  ECF No. 1.  Thus, "the six-year statute of limitations applicable to [this Court] would ordinarily bar plaintiff['s] claim[s] to the extent [they] 'first accrued' prior to" April 20, 2010.  *Menominee Tribe*, 726 F.2d at 720.  In this case, the Tribe's claims are barred by the statute of limitations because the underlying facts predate April 20, 2010.[34]  Indeed, for the majority of the counts in the Complaint, no material fact has changed since at least 1996, and no material fact in the Complaint post-dates 2006.[35]

---

[33] The government argues, and the Court agrees, that the Tribe has not established "that the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties' imposed by the governing law."  Def. Mot. at 31 (quoting *Navajo II*, 556 U.S. at 291).  Indeed, the Tribe makes no attempt, in its response to the government's motion to dismiss, to show that the government's failure to provide an accounting, alone, gives rise to monetary damages.  Without any precedent to support its claim, this Court must conclude that the Tribe has not met its burden to establish that the sources of law on which the Tribe relies are money-mandating.  In any event, for the same reasons that all of the Tribe's claims at issue here are barred by the statute of limitations — as explained in more detail *infra* — the Tribe's claim for a better accounting in any court likely would be barred by the statute of limitations with respect to any years preceding 2010.  *See* 28 U.S.C. § 2401(a) (providing six-year statute of limitations for APA claims).

[34] The Tribe filed its initial complaint on April 20, 2016.  ECF No. 1.  The Tribe's response to the government's motion to dismiss provides that "the earliest date that the United States reasonably could be found to have repudiated the Tribe's trust claims was on April 16, 2016, the date that the Tribe filed the instant lawsuit."  Pl. Resp. at 24.  The Court believes that the reference to April 16, 2016, was a mistake, but in any event holds that the Tribe's claims are time-barred regardless of whether the relevant date is April 16 or 20, 2016.

[35] As the government correctly notes:

> In this case, it is clear from the Second Amended Complaint that Plaintiff knew or should have known of the key events underlying its "breach of trust" claims: the Congressional grant to the United States of title and interest to certain tribal lands of the Chemehuevi

a)      **Count I & Count II**

In Count I and Count II of the Complaint, the Tribe alleges that the United States, *may* have mismanaged certain monies held in trust for the Tribe's benefit.[36]  Assuming for the purposes of this Section that the Tribe's equivocal allegations[37] satisfy RCFC 12(b)(6), the Court naturally must ask when did those claims accrue?

Before answering that question, we begin with an axiom:  where a plaintiff states a claim as a matter of law sufficient to survive a motion to dismiss pursuant to RCFC 12(b)(6), the claim necessarily accrued *at the latest* on the date the plaintiff filed the

> Reservation for construction of the Parker Dam Project; the Congressional mandate to the Secretary of the Interior to determine the amount of money to be paid to Plaintiff as just and equitable compensation (Compl. ¶ 23); the taking of 7,136.53 acres of tribal lands, most of which was flooded (*id.* ¶ 27); Plaintiff's loss and subsequently the federal ownership and administration of the shoreline property riparian to Lake Havasu (*id.* ¶ 29); the return by Secretarial Order on November 1, 1974, to Plaintiff of full equitable title to 21 miles of shoreline land after 33 years (*id.* ¶¶ 125-126); after the return, Plaintiff's receipt of income from the shoreline land (in the form of rents and leases) and from profit distributions from the Havasu Landing Resort (*id.* ¶ 131); Plaintiff's usage of its Winters water rights, in comparison to other users, and the lack of payments from junior water rights users (*id.* ¶ 118); the Secretary's refusal to sign Plaintiff's proposed water rights lease for off reservation use (*id.* ¶ 112); and the lack of a "complete, meaningful accounting" that Plaintiff deemed to be necessary for the monies that, decades ago, Plaintiff knew were in its accounts but now Plaintiff is unsure about receiving (*id.* ¶¶ 30, 134).  It is also clear from the Second Amended Complaint that Plaintiff knew (or should have known) of any alleged financial and other impacts from the government's actions, which gave rise to Plaintiff's claims herein, many decades before 2010 (six years before the filing of this case). *Id.* ¶¶ 29, 30, 33, 36, 47-49, 93, 94, 108, 125-12.

Def. Mot. at 16–17.

[36] Count I is a "Claim For Accounting And Damages For Mismanagement of Parker Dam Compensation Monies" and Count II is a "Claim for Accounting and Damages for ICC Judgment Funds."  Compl. ¶¶ 30, 35.

[37] The Tribe's claim in Count I admits that the Tribe does not know whether it was ever paid the funds it claims.  *Id.* ¶¶ 87–91 (alleging that the Tribe is "entitled to recover damages for any and all mismanagement by the Federal Government of the Parker Dam Compensation Monies" but without alleging any non-conclusory facts which, if true, demonstrate mismanagement).  The Tribe's claim in Count II similarly alleges the lack of an adequate accounting but equivocates about whether the Tribe has been paid or was damaged.  *Id.* ¶¶ 92–97.

complaint. So, when does the Tribe contend its claims accrued? According to the Tribe, "the earliest date" that its trust mismanagement claims accrued was when "the United States reasonably could be found to have repudiated the Tribe's trust claims…on April [20], 2016, *the date that the Tribe filed the instant lawsuit*."[38] Pl. Resp. at 24 (emphasis added).

Putting aside that trust misfeasance or mismanagement claims do not require repudiation to trigger claim accrual, *Catawba Indian Tribe of S.C.*, 24 Cl. Ct. at 31,[39] there is a reason the Tribe is all but compelled to assert that its claims arose on the day the Tribe filed its Complaint. That is because identifying *any earlier* date would merely beg a question fatal to the Tribe's position: what new fact did the Tribe learn on that yet earlier date — triggering the accrual of the claims — that the Tribe did not know prior to April 20, 2010? The Tribe might not want to face that last question, but the Court must do so. And the answer is that there simply is no new factual predicate for the claims at issue that the Tribe suddenly learned on the filing date of the Complaint; nor, for that matter, are there any material facts arising after April 20, 2010 upon which the Tribe relies in its Complaint. Put yet differently still, every factual allegation in the Complaint related to putative trust fund mismanagement was known to the Tribe before April 20, 2010, including the alleged lack of accounting documentation.

With respect to Count I, for example, the Tribe divides its factual allegations into two time periods: "1940-1970" (*see* Compl. ¶¶ 76–84); and "1970 to the present time" (*see id.* ¶¶ 85–86). Of course, 1970 predates 2010 by 40 years. And there is no allegation — not one shred of a fact — even suggesting that the Tribe learned something new *after* April 20, 2010 that triggered the accrual of its claim. Notably, the Tribe alleges that "[t]he Federal Government has never provided the Tribe with a complete accounting of the Parker Dam Compensation monies from 1970 up to the time this Second Amended Complaint was filed." *Id.* ¶ 86. But that means that the Tribe could have lodged that same complaint in every single year *after* 1970, "when federal recognition of the Tribe was restored." *Id.* ¶ 83. To be clear, according to the Complaint, the *public* record establishes that the funds in question ($108,104.95) had been deposited in an account for the benefit of the Chemehuevi in 1940. *Id.* ¶ 26. But, there were no factual developments following the 1996 Arthur Andersen Report. That means either the Tribe currently has insufficient facts to maintain a claim, or if the facts are sufficient to state a claim as a matter of law, they were known to the Tribe at the latest when the Tribe

---

[38] *See supra* note 34 (addressing incorrect reference in Tribe's response to the government's motion to dismiss); ECF No. 1 (filed April 20, 2016).

[39] *See also Cherokee Nation of Okla. v. United States*, 21 Cl. Ct. 565, 571–72 (1990) ("This general rule is not applicable to the facts alleged in this case. Plaintiff here made no allegation that defendant repudiated the trust, but alleged misfeasance or nonfeasance by the defendant as trustee. . . . Because these allegations involve misfeasance or nonfeasance, the existence of a trust relationship does not act to toll the statute of limitations."); *Hopland Band of Pomo Indians*, 855 F.2d at 1578–79 (discussing rule).

received its 1996 Arthur Andersen Report.  Either way, Count I must be dismissed.
That jurisdictional discovery may have confirmed what the Tribe already knew (*i.e.,* an
alleged absence of accounting information) does not constitute a new fact triggering
claim accrual, particularly when the Tribe was aware that it lacked such information for
forty years or at least since the 1996 Arthur Andersen Report.  Def. Supp. Br. at 3.

With respect to Count II, the statute of limitations problem is equally glaring.
Congress appropriated the ICC judgment funds at issue in 1965.  Compl. ¶ 93.  The
Tribe complains that "no accounting has ever been made by the Federal Government to
the Tribe regarding the retention . . . and/or the ultimate disbursement or disposition of
the ICC Judgment Funds" from "June 1965 until at least September 1970."  *Id.* ¶ 94.  The
Tribe's Complaint references two statutes:  the initial appropriation by the ICC
judgment through the Act of June 30, 1965 and the Act of September 24, 1970, the latter
of which authorized the ICC Judgment funds "for distribution in *per capita* payments to
tribal members."[40]  *Id.* ¶ 93.

Nothing about the Tribe's situation or knowledge with respect to those ICC
judgment funds, however, has changed since the 1970s, or, at the latest, since the 1996
Arthur Andersen Report.  Again, to the extent the Complaint contains sufficient facts to
state a claim, such facts are many decades old or were derived from the 1996 Arthur
Andersen Report, and thus Count II is barred due to the statute of limitations.  In the
alternative, as discussed below (*see infra* Section IV.B.), to the extent the Tribe lacks
sufficient facts because of the inadequacy of the 1996 Arthur Andersen Report, the Tribe
fails to state a claim and its Complaint must be dismissed pursuant to RCFC 12(b)(6).
The Tribe bears the burden to demonstrate jurisdiction, but points to no fact arising
within the six years preceding the filing of the Complaint to demonstrate that Count II
accrued during that time period and thus was filed in a timely manner.

Accordingly, the Court holds that Counts I and II must be **DISMISSED** for lack
of jurisdiction.

### b)      Count III

In Count III of the Tribe's Complaint, the Tribe alleges that the government is
liable for the taking and mismanagement of tribal water rights.  Those water rights,
however, "were specifically quantified" in the "Supreme Court's decree of March 9,
1964."  Compl. ¶ 103 (discussing *1964 Arizona Decree*, 376 U.S. 340).  The Tribe further
alleges that such "quantified water rights were confirmed by the supplemental orders
entered by the Supreme Court in 1979 and 1984 . . . and, most recently, . . . in 2006."  *Id.*
(citing *Arizona v. California*, 466 U.S. 144 (1984); *Arizona v. California*, 439 U.S. 419 (1979)
(per curiam); *Arizona v. California*, 547 U.S. 150, 157 (2006)).  In the Tribe's view — one

---

[40] The Tribe relies only upon the latter as a money-mandating provision of law.  ECF No. 79-1 at
4; *see also* Compl. ¶ 95(b).

that we reject as a matter of law (*see infra* Section IV.B.) — the government effectuated a taking "of the Tribe's quantified water rights[,]" by having "declared the bulk of the Tribe's annual allocation 'surplus water'" and in making "that water available to other junior users, . . . without any compensation to the Tribe." Compl. ¶ 108.

Although the Tribe likely had full notice of its (and others') water rights and usage following the Supreme Court's decree in 1964, the Complaint confirms that the Tribe had notice of the government's alleged "taking" in 1998 *at the absolute latest*. For example, in 1998, "the Tribe propose[d] to lease . . . water to the Southeastern Nevada Water Company" instead of allowing others to use the Tribe's "water allocation annually without providing compensation to the Tribe." Compl. ¶ 109 (incorporating ECF No. 45-8 (TRC Mariah Associates, Environmental Assessment, Section 1.0 PURPOSE AND NEED FOR ACTION (Dec. 1998)). Indeed, the Tribe alleges that "[t]he Secretary of the Interior . . . failed and refused to exercise his power and authority . . . to approve . . . the proposed 25-year lease by the Tribe of 5,000 acre feet of the Chemehuevi quantified water rights to the Southeastern Nevada Water Company[.]" *Id.* ¶ 112. Thus, the Tribe alleges that "Interior has continued to make the bulk of the Tribe's annual water allocation available to other junior users . . . without compensation being paid to the Tribe, *from 1999 up until the time of filing of this Second Amended Complaint.*" *Id.* (emphasis added). That is the end of the line for Claim III; having accrued prior to 2010, it is clearly barred by the statute of limitations.[41]

Accordingly, Count III is **DISMISSED** for lack of jurisdiction.

### c)   Count IV

Count IV seeks compensation for "[t]he Government's long-term confiscation and deprivation of the use by the Chemehuevi Tribe of the Chemehuevi Reservation's twenty-one (21) miles of Colorado River Shoreline for thirty-three (33) years without any payment to the Tribe of compensation for the use, lease, and/or temporary taking of the shoreline and related assets…." Compl. ¶ 128. The statute of limitations clearly bars this claim.

The Tribe's Complaint itself discloses that the government took the shoreline land in question (and its associated rights or assets) in 1940 or 1941. Compl. ¶ 125; *see*

---

[41] The Court agrees with the government that "Count III concerns the management of water rights determined in 1963" — publicly, in a Supreme Court decision — "along with a specific allegation regarding the failure to approve a 25-year leasing agreement in 1998." Def. Mot. at 14. Even assuming for the sake of argument that the Supreme Court decision in question had given the Chemehuevi the right to sell unused water to a third-party, the Tribe never alleges that it tried to do so prior to 1998 or 1999, but the government somehow stood in the Tribe's way. And to the extent the government did preclude the Tribe from selling such water prior to 1998, Claim III is time-barred in any event.

*also id.* ¶¶ 22, 26-27 (the Secretary of the Department of the Interior "approved payment to the Chemehuevis of $108,104.95" for "lands taken"). Putting aside that the government voluntarily returned that land to the Tribe *after* having paid just compensation, in 1940,[42] for a permanent taking,[43] the alleged 33-year "temporary taking"[44] period for which the Tribe now seeks compensation — *for the same property* — concluded in November 1974.[45] Thus, even assuming the Tribe would have had a viable claim in 1974 — and that is not the case — the time to pursue its temporary takings claim has long since passed.

In sum, the Court agrees with the Government that to the extent the Tribe "is attempt[ing] to challenge the justness of the compensation it received in 1942 for the Shoreline land when it was acquired for legitimate public purposes, the Complaint contains no allegations of the inadequacy or unjustness of the compensation it received, and even it had, the time for any such challenge lapsed decades ago." Def. Mot. at 33.

The Tribe's claim for compensation for a temporary taking of land between 1941 and 1974 is **DISMISSED** for lack of jurisdiction.

### 3.   The ITAS Provisions Do Not Save The Tribe's Claims From Dismissal Based On The Applicable Statute Of Limitations

As explained more fully *infra*, the Court holds that the tolling language that Congress enacted in the ITAS provisions cannot save the Tribe's untimely claims. Even assuming, however, that our approach to the statute of limitations issue and the ITAS provisions does not support granting the government's motion to dismiss, the Tribe's Complaint pleads itself right out of court. In particular, the Tribe alleges:

> The deficiencies and gaps endemic to the Federal Government's accounting system severely *limited* the Chemehuevi Tribe's ability to determine *the full extent of its losses* as a result of the Federal Government's breaches of its fiduciary duties. This problem has *not been cured* by the Federal Government's preparation and release of the Chemehuevi Tribe's Arthur Andersen Report. . . .

---

[42] Compl. ¶ 30 ("It is undisputed that these funds were placed in a Treasury Account from 1940 until at least June 5, 1970[.]").

[43] For that reason alone, the Court **GRANTS** the government's motion to dismiss for failure to state a claim, *see infra* Section IV.B.

[44] Compl. ¶ 128.

[45] The government's returning of the land to the Chemehuevi was not concealed. Pl. Resp. at 64–65.

Compl. ¶ 63 (emphasis added).  That assertion is fatal to the Tribe's **entire** Complaint[46] because the assertion demonstrates that the Tribe, indeed, *was* aware "of its losses" resulting from the "Government's breaches of its fiduciary duties" even *before* the 1996 Arthur Andersen Report, just not "the full extent" of such losses.  Not only does that admission give away the proverbial farm, it also demonstrates that the ITAS tolling provision does not apply for the simple fact that an accounting was not necessary for the Tribe to determine "a loss."  *Wolfchild*, 731 F.3d at 1291 (holding that "claims about 'losses' or 'mismanagement' that are protected by this provision are those for which an accounting matters in allowing a claimant to identify and prove the harm-causing act at issue; otherwise, the ITAS would give claimants the right to wait for an accounting that they do not need"); *Goodeagle*, 111 Fed. Cl. at 721–22 ("[T]he Appropriations Act language displaces 28 U.S.C. § 2501 in those circumstances where a 'final accounting' is necessary to put the tribe on notice that a breach of a fiduciary obligation has occurred." (citing *San Carlos Apache Tribe*, 639 F.3d at 1355)).  The Tribe has the burden to demonstrate the timeliness of its claims and despite two-and-a-half years of jurisdictional discovery and the filing of its Second Amended Complaint, the Tribe either admits its claims are untimely or otherwise has failed to meet its burden.  At a minimum, in 1996, the clock started to run on both its APA claim for an accounting in district court and the Tucker Act claims it now pursues here.

\* \* \* \*

In 1987, Congress required the government to audit and reconcile tribal trust funds and to provide the tribes with an accounting of such funds pursuant to the Act of December 22, 1987, Pub. L. No. 100-202, 101 Stat. 1329.  Compl. ¶ 57.  Congress subsequently amplified that requirement in 1994, in the ITFMRA, providing that "[t]he Secretary [of the Interior] shall transmit to the Committee on Natural Resources of the House of Representatives and the Committee on Indian Affairs of the Senate, by May 31, 1996, a report identifying for each tribal trust fund account for which the Secretary is responsible a balance reconciled as of September 30, 1995[.]"  25 U.S.C. § 4044

---

[46] This assertion is incorporated by reference in each count of the Complaint.  *See* Compl. ¶¶ 74, 92, 98, 124, 138; *see also id.* ¶ 143 (alleging government's accounting systems "severely limited the Chemehuevi Tribe's ability to determine *the full extent of its losses* as a result of the Federal Government's breaches of its fiduciary duties" and that "[t]his problem has not been cured by the Federal Government's preparation and release of the 199[6] Arthur Andersen Report" (emphasis added)).  Statutes of limitations ordinarily begin to run where "Indians were capable enough to seek advice, launch an inquiry, and discover through their agents the facts underlying their current claim." *Menominee Tribe*, 726 F.2d at 721; *Brown v. United States*, 42 Fed. Cl. 538, 555 (1998) (quoting same), *aff'd*, 195 F.3d 1334 (Fed. Cir. 1999); *see also Shoshone Indian Tribe of Wind River Rsrv., Wyo.*, 672 F.3d at 1030–33 (statute of limitations ran where tribes not prevented "from being aware of the material facts that gave rise to their claim," even if they were not "aware of the full extent of their injury").  The government is correct:  "[t]he same questions that Plaintiff raises now could have been raised decades ago."  Def. Supp. Br. at 4.

("Reconciliation report").  That statute further required such reconciliation reports to include:

> (1) a description of the Secretary's methodology in reconciling trust fund accounts;
>
> (2) attestations by each account holder that —
>
>> (A) the Secretary has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance as reconciled by the Secretary; or
>>
>> (B) the account holder disputes the balance of the account holder's account as reconciled by the Secretary and statement explaining why the account holder disputes the Secretary's reconciled balance; and
>
> (3) a statement by the Secretary with regard to each account balance disputed by the account holder outlining efforts the Secretary will undertake to resolve the dispute.

*Id.*  In addition, the ITFMRA required that Interior perform "an annual audit on a fiscal year basis of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian," now codified at 25 U.S.C. § 4011(c), and issue a report that identifies "for each tribal trust fund account for which [Interior's] Secretary is responsible[,] a balance reconciled as of September 30, 1995." 25 U.S.C. § 4044; *see Osage Nation*, 57 Fed. Cl. at 394 n.3 (discussing 25 U.S.C. § 4044).

   The United States, to meet its various statutory duties, retained an accounting firm, Arthur Andersen, to prepare and issue reconciliation reports to all federally recognized tribes.[47]  Compl. ¶ 58.  The Tribe received its reconciliation report on

---

[47] The Tribe and the government dispute whether Arthur Andersen prepared the 1996 Arthur Andersen Report for the Chemehuevi pursuant to the Act of December 22, 1987, Pub. L. No. 100-202, 101 Stat. 1329, *see* Compl. ¶ 57, or the ITFMRA.  *See* Def. Supp. Br. at 1–2.  This Court previously has explained the statutory basis for the Arthur Andersen reports, as follows:

> Near the end of the 1980s, it appears that Arthur Andersen performed various work for the BIA, including financial and compliance audits of the BIA Office of Trust Funds Management for the fiscal years ending September 30, 1988, 1989 and 1990. Although this is unclear, the impetus for these audits may have been statutes Congress passed from 1987 to 1991 requiring audits of tribal trust accounts. On May 24, 1991, BIA and Arthur Andersen

January 8, 1996.  ECF No. 7-4 (Federal Express delivery receipt).  The Tribe also submitted an acknowledgment of the receipt of the report, dated February 9, 1996, in which the Tribe noted that it "required additional time to review the report *and has no response for acceptance or dispute*."  ECF No. 56-3 (emphasis added).  The Tribe further "request[ed] an individual meeting with the BIA to discuss their tribal-specific questions or concerns regarding the Reconciliation Report at a Regional Meeting" to take place in Phoenix on March 19-22, 2016.  *Id.*[48]

---

> entered into a new contract "to assure that the accounting records and the accounting balances in the Tribal and Individual Indian Monies (IIM) accounts are reconciled as accurately as possible back to the earliest date practicable using available accounting records and transaction data."  This contract anticipated the active involvement of the tribes in the reconciliation process and indicated that both the BIA and the relevant tribes would receive copies of the final reports and supporting documents.  This reconciliation process was apparently ongoing when, in 1994, Congress enacted the aforementioned Trust Fund Reform Act, requiring the Secretary of the Interior to "account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian Tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a); *see also Eastern Shawnee Tribe of Oklahoma v. United States*, 82 Fed. Cl. 322, 324 (2008).  This statute also required the tribes to either accept or dispute the reconciled account balances, with that information to be included in a report to Congress from the Secretary of the Interior by May 31, 1996. 25 U.S.C. § 4044.  On December 31, 1995, Arthur Andersen completed its reconciliation of tribal trust funds for the period July 1, 1972, through September 30, 1992, and, at or around that time, delivered reports and account statements to both the BIA and the tribal account owners. In a modification of the 1991 contract, dated March 5, 1996, BIA engaged Arthur Andersen to assist it in entering into "settlement discussions" with the tribes."

*Jicarilla Apache Nation v. United States*, 88 Fed. Cl. 1, 16–17 (2009).  Accordingly, this Court concludes that the 1996 Arthur Andersen Report was prepared and provided to the Tribe, pursuant to several statutory provisions, including 25 U.S.C. § 4044, as amended. *Id.*; *see also* ECF No. 90-10 at 2 ("The BIA will present and explain in-depth the report procedures and findings for the two (2) tribal trust funds reconciliation reports as mandated by the American Indian Trust Fund Management Reform Act of 1994.").

[48] *See* ECF No. 90-10 (BIA document describing 1996 "National & Regional Meetings" regarding "Tribal Trust Funds: Reconciliation Procedures and Findings").  Indeed, BIA appears to have provided the Tribe with every opportunity to understand its 1996 Arthur Andersen Report.  BIA provided the Tribe with five optional locations and dates to conduct an individual meeting to discuss "tribal-specific questions or concerns regarding the Reconciliation Report."  ECF No. 56-3 at 2.  Additionally, BIA held a national meeting in Albuquerque, New Mexico, to

In 2002, Congress passed "[a]n Act to encourage the negotiated settlement of tribal claims" that provided as follows:

> Notwithstanding any other provision of law, for purposes of determining the date on which an Indian tribe received a reconciliation report for purposes of applying a statute of limitations, any such report provided to or received by an Indian tribe in response to [the ITFMRA] shall be deemed to have been received by the Indian tribe on December 31, 1999.

*See* An Act to Encourage the Negotiated Settlement of Tribal Claims, Pub. L. No. 107–153, 116 Stat. 79 (Mar. 19, 2002). Congress subsequently updated the deemed-receipt date, and, thus, irrespective of the actual date of the Tribe's receipt of the Arthur Andersen Report, all such reports were "deemed to have been received by the Indian tribe on December 31, 2000" pursuant to section 304 of the ITFMA, 25 U.S.C. § 4044 note, Pub. No. L. 107-153 § 1, 116 Stat. 79 (Mar. 19, 2002), as amended, Settlement of Tribal Claims—Amendment, Pub. L. No. 109-158 § 1, 119 Stat. 2954 (Dec. 30, 2005). *See* Compl. ¶ 65.[49]

The reason for the statutorily-extended deemed-received date was to alleviate the pressure on Indian claimants to sprint to court, particularly where they and the

___

"present and explain in-depth the report procedures and findings for the two (2) tribal trust funds reconciliation reports as mandated by the American Indian Trust Fund Management Reform Act of 1994." ECF 90-10 at 1. BIA offered to "pre-pay the airline ticket and reimburse lodging and per diem expenses" for a representative of the Tribe to attend both the national and any regional meeting so that BIA could "address questions and/or concerns related to the tribal trust funds accounts." *Id.* While the Tribe contends that no Chemehuevi representative attended the national meeting in Albuquerque, *see* Pl. Supp. Br. at 2, the Tribe's decision not to accept BIA's offer does not demonstrate "excusable ignorance" sufficient to toll the statute of limitations. *Brown v. United States*, 195 F.3d 1334, 1338 (Fed. Cir. 1999).

[49] Although the Tribe contends that it "received the [complete] Arthur Andersen Report in the mail on March 1, 1996[,]" — and not on January 8, 1996 (the date of the government's Federal Express receipt, ECF No. 7-4) — the discrepancy between the two dates is immaterial given that the Tribe is deemed to have received the Report on December 31, 2000, by operation of law. Pl. Supp. Br. at 2. The Tribe further contends that its "claims . . . are not time barred because the statute of limitations did not start to run in 1996[,]"Pl. Supp. Br. at 3, but that date is a red herring of sorts. For the purpose of determining when the statute of limitations was triggered (and began to run), the relevant date is provided by statute: December 31, 2000. Even under that more generous date, however, the Tribe's claims would be barred as of December 31, 2006 — well before the Tribe filed the instant case — assuming the ITAS provisions do not save the covered claims. The Court further notes that many of the Tribe's claims were barred well before that; only the claims for which an accounting is relevant are addressed in this section. *See Wolfchild*, 731 F.3d at 1291; *Shoshone Indian Tribe*, 364 F.3d at 1343.

government continued to wrangle over the quality of accounting documents provided to the trust beneficiaries (*i.e.*, would-be plaintiffs).[50]  The reason for the disputes over the quality of the accounting documents arose from the ITAS tolling provisions themselves.  *See* S. Rep. No. 109-201, at 2 (2005) (noting that "questions have arisen as to the adequacy and reliability of the reconciliation reports, and as to whether such reconciliation reports constituted an 'accounting' for the purpose of the language set forth in numerous Department of Interior Appropriations Acts" and that "it is not at all clear that the reconciliation reports at issue did in fact constitute an 'accounting' sufficient to commence the running of the statute of limitations").

In other words, because the ITAS provisions suspended the running of the statute of limitations until the tribes received an accounting, and because there were disputes regarding whether the reconciliation reports constituted an accounting sufficient to trigger the statute of limitations (and avoid the ITAS tolling provision), Congress reset the tribes' receipt deadline to discourage potential claimants from running to court.  In extending the deemed-receipt date, however, the legislative history at least suggests that Congress did not intend to take a position on what qualified as an accounting, as a matter of law, sufficient to trigger the statute of limitations.  *Id.* at 2–3; *see also* S. Rep. No. 107-138, at 5 (2002) ("[N]either the bill nor Congress' action in approving this bill should be construed to favor any one of the competing interpretations of the provisions of appropriations acts which preclude the statute of limitations from commencing to run until an Indian tribe has received an 'accounting' and/or 'an accounting of such funds from which the beneficiary can determine where there has been a loss.'").  Nor does the plain language of any statutory provision answer the question.

The upshot of all of this is that Congress did not determine whether reconciliation reports constituted a *per se* satisfaction of the ITAS tolling provision, or whether a court must undertake a fact-intensive review of such reports to decide whether the ITAS tolling provision was satisfied.  Nor has the Federal Circuit spelled out in any detail what constitutes a "meaningful accounting."  And, while some decisions of this Court, as noted *supra*, appear to interpret the ITAS tolling provisions and the Federal Circuit's "meaningful accounting" standard as requiring *something* more than what is ordinarily required to trigger breach of trust claim accrual, the plain language of the statute does not support that conclusion, any more than the legislative history.

---

[50] The express purpose of deeming the accounting reports received at a later date was contained in the statute itself:  the December 31, 2000 date "is solely intended to provide recipients of reconciliation reports with the opportunity to postpone the filing of claims, [and] to encourage settlement negotiations with the United States."  Pub. No. L. 107-153 § 1(b) ("Statement of purpose").

Given the statutory framework, there are three possible scenarios that could have resulted from the Arthur Andersen reports. First, a tribe might consider its Arthur Andersen report to be a full and complete accounting of that tribe's trust funds, and the tribe would agree with the balances as reported. In that scenario, the statute of limitations would have commenced, but no litigation would have been necessary. Second, a tribe might consider its Arthur Andersen report to be a full and complete accounting of that tribe's trust funds, but the tribe would disagree with the balances as reported. In that scenario, the statute of limitations would begin to run on any claim for monetary damages on the day the tribe received its report and the tribe could bring a claim for monetary damages to this Court within six years. In both of those scenarios, the ITAS tolling provisions play no role.

In the third scenario, however, a tribe might believe that its Arthur Andersen report was not a full and complete accounting of that tribe's trust funds. In that case, the tribe would have six years from the date the tribe received its Arthur Andersen report to challenge the agency action — that is, the adequacy of the accounting given the government's statutory duty to prepare one — under the Administrative Procedure Act ("APA"). *See* 28 U.S.C. § 2401(a) (providing six-year statute of limitations for APA claims).[51] At the conclusion of any APA litigation, a tribe may receive a declaratory judgment that its accounting was incomplete and an order, directing BIA to produce a complete accounting. Given that such litigation may take years and that it may take additional time thereafter for BIA to compile a complete accounting, the ITAS essentially operates to toll the statute of limitations, such that at the conclusion of that lengthy process, the tribe could then bring its claim for monetary damages in this Court. *See Tohono O'Odham Nation*, 563 U.S. at 316–17.

What a tribe may not do is what Plaintiff has done here: fail to dispute the adequacy of its Arthur Andersen report for sixteen years and then file an equivocal claim — that is devoid of factual allegations — in this Court, while attempting to invoke the ITAS tolling provisions in order to save, or resurrect, its otherwise untimely challenge to the quality of the accounting the Tribe received. Perhaps the Court might take a different view if some new fact had come to light within the six years preceding the Tribe's filing of the Complaint that, coupled with the 1996 Arthur Andersen Report, showed that it was not sufficiently meaningful to put the Tribe on notice of a loss. The Court, however, provided the Tribe with more than two years of jurisdictional discovery to uncover any such facts, but the Tribe failed to do so. Accordingly, the Tribe has failed to satisfy its burden to prove that this Court possesses subject-matter jurisdiction over its claims.

---

[51] This scenario assumes that the presentation of an Arthur Andersen report represented final agency action. To the extent that the presentation of an Arthur Andersen report was not final agency action, a tribe would have six years to bring an APA challenge to the sufficiency of the accounting from whatever later date the agency action became final.

The language of 25 U.S.C. § 4044 supports the Court's interpretation of the statutory framework and its application to the Tribe's Complaint.  Section 4044 of Title 25 of the United States Code provides that the Tribe was required either **(a)** to acknowledge that the government had provided the Tribe "with as *full and complete accounting as possible* of the account holder's funds to the earliest possible date, and that the account holder accepts the balance as reconciled by the Secretary"; *or* **(b)** to "dispute[] the balance of the . . . account as reconciled by the Secretary [with a] statement explaining why the account holder disputes the Secretary's reconciled balance[.]"  25 U.S.C. § 4044(2)(a)–(b) (emphasis added).  Where a tribe disputes a balance, the Secretary then must include a statement in the report "outlining efforts the Secretary will undertake to resolve the dispute."  *Id.* § 4044(3).[52]  Congress did not provide a third option for an open-ended, unlimited duration for the Tribe to consider whether the accounting was "full and complete" and accurate, or whether to dispute a particular balance.  Nor did Congress provide, with the ITAS tolling provisions, an avenue for the Tribe to bring an untimely APA action in this Court.

In this case, the Tribe contends that it "never submitted an Attestation Form accepting the Report," Pl. Supp. Br. at 2, but that is plainly not the case.  *See* ECF No. 56-3 ("Acknowledgment required by Sec. 304(2) of P.L. 103-412").[53]  The Tribe makes no attempt to explain the attestation in the record, which, along with the Tribe's request for a meeting with the Department of the Interior, demonstrates that the Tribe received the 1996 Arthur Andersen Report and had ample time to examine, understand, and dispute it — or to challenge that it was a "full and complete accounting" *in district court.  Id.*  In other words, having provided the Tribe with a reconciliation report pursuant to 25 U.S.C. § 4044, Interior essentially asserted to the Tribe that the 1996 Arthur Andersen Report was as "meaningful" of an accounting as the Tribe was ever going to receive.  Rather than promptly proceed to district court to seek the accounting the Tribe now improperly seeks in this Court, the Tribe sat on its rights.  In that regard, the Court notes once again that "the Indian beneficiary of a trust, no less than any other, is charged with notice [i.e., knowledge] of whatever facts an inquiry appropriate to the circumstances would have uncovered."  *Brown*, 42 Fed. Cl. at 554 (internal quotation omitted), *aff'd*, 195 F.3d 1334 (Fed. Cir. 1999); 42 Fed. Cl.

---

[52] Indeed, these "efforts" may lead to final agency action sufficient to trigger the APA's statute of limitations clock.  28 U.S.C. § 2401(a) (providing six-year statute of limitations for APA claims); *see also Nez Perce Tribe v. Kempthorne*, No. 06-2239, 2008 WL 11408458, at *2 (D.D.C. Dec. 1, 2008) (discussing tribal lawsuit "filed on December 28, 2006, three days before a generic period of limitations for federal suits would run on a claim that accrued on December 31, 2000," seeking "a judgment declaring that the TRP Reports are not complete accountings of tribal trust funds and that the plaintiffs have not otherwise received such an accounting").

[53] The Tribe nowhere disputes the authenticity of this document, and the Plaintiff bears the burden of demonstrating that its claims are timely.

at 549 ("Substantial precedent holds that Indians are not granted special consideration on the basis of ignorance of the accrual of claims under the statute of limitations.").

In an attempt to evade the impact of having received the 1996 Arthur Andersen Report long ago, the Tribe now contends that "the Arthur Andersen Report itself did not purport to be an accounting." Pl. Supp. Br. at 3. But that contention is refuted not only by § 4044, but also by the Tribe's own Complaint, in which the Tribe specifically alleges that the 1996 Arthur Andersen Report was prepared in response to a congressional mandate "(1) to audit and reconcile tribal trust funds and (2) to provide the Chemehuevi Tribe and other tribes with an *accounting* of such funds." Compl. ¶ 57 (emphasis added); *see also id.* ¶ 58 ("To satisfy the requirements of the Act of December 22, 1987, the Federal Government, among other things, retained the accounting firm of Arthur Andersen LLP . . . to prepare and issue reports to the Chemehuevi Tribe and other federally recognized tribes.").

In any case, the Tribe admits that the 1996 Arthur Andersen Report included approximately 6,000 images, including roughly 400 deposit tickets, 60 vouchers and schedules of payment, and 40 reconciliation checklists, among other documents. Pl. Supp. Br. at 1. The Tribe recently may have developed some legitimate gripes about the Report's readability or clarity, *id.* at 1-2, but the Tribe — as explained *supra* — had every opportunity to engage with the government to understand the Report's contents and conclusions, and to register disagreement. *Shoshone Indian Tribe of Wind River Rsrv., Wyo.,* 672 F.3d at 1032 ("As explained in both *Menominee* [*Tribe*] and *Catawba* [*Indian Tribe*], a trust beneficiary's subjective ignorance of the law giving rise to its claim, even if predicated on misleading statements relating to those legal rights, does not toll the accrual of the statute of limitations." (internal citations omitted)). The Tribe, however, having stuck its head in the sand, cannot now raise it out, complain about the quality of the Report, and allege that it knows it has suffered a loss — but decline to allege any supporting *facts*, as opposed to conclusory legal assertions — all while variously insisting that it may or may not know anything based upon the Report. *Id.* at 3 ("The Arthur Andersen Report contains no information relating to any of the Tribe's claims in this case for loss or mismanagement of funds held in trust . . . .").[54]

---

[54] Even if the ITAS tolling provisions were not satisfied, however, we should be clear about what types of claims the provisions potentially cover:

> The Federal Circuit repeatedly has held that "claims related to trust funds involve losses 'resulting from the Government's failure to timely collect amounts due and owing to the Tribes' under relevant contracts, while claims related to trust assets involve losses resulting from the terms of a contract being suboptimal." [T]he tolling provisions of the Appropriations Act riders only apply to claims for mismanagement of trust funds.

* * * *

Finally, for the first time in its response to the government's motion to dismiss,[55] the Tribe, relying on *Pueblo of San Ildefonso v. United States*, 35 Fed. Cl. 777, 790 (1996), asserts that the "continuing claims doctrine" saves its otherwise untimely claims. *See* Pl. Resp. at 19–20.  In *Pueblo of San Ildefonso*, the Court explained that "Plaintiff has the burden of establishing a continuing wrong."  35 Fed. Cl. at 790.  The Tribe's mere invocation of the continuing claims doctrine — without so much as identifying to which claims the doctrine applies — does not satisfy the Tribe's burden.  The Tribe's Complaint does not contain a single factual allegation of a continuing wrong that can be "broken down into a series of independent and distinct events or wrongs."  *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997).  The Court is not bound to accept the Tribe's naked, conclusory legal assertions that the government breached its fiduciary duties, and the Court will not further find that these legal conclusions — without any factual support — represent continuing wrongs for the purposes of establishing jurisdiction.

Accordingly, the Court **GRANTS** the government's motion to dismiss the Complaint pursuant to RCFC 12(b)(1).

### B.   Counts II, III, And IV Of The Tribe's Complaint Fail To State A Claim As A Matter Of Law

The government, in its motion to dismiss, alternatively argues that this Court should dismiss Counts II, III, and IV of the Tribe's Complaint for failure to state a claim

---

*Goodeagle v. United States*, 111 Fed. Cl. 716, 724–25 (2013) (internal citations omitted) (quoting *Shoshone Indian Tribe of Wind River Rsrv., Wyo.*, 672 F.3d at 1034–35 (quoting *Shoshone Indian Tribe*, 364 F.3d at 1350–51)).  An accounting would not disclose any facts or provide any useful information regarding claims about suboptimal investments, most notably those in Count Three of the Tribe's Complaint.  Compl. ¶¶ 114–17; *Goodeagle*, 111 Fed. Cl. at 721–22 ("As applied to this case, a 'final accounting' logically would be necessary to address trust fund losses on actual leases.  However, a 'final accounting' would not be necessary for hypothetical leases that were never executed.  Thus, the Court concludes that Plaintiffs' third cause of action is timely as to allegations relating to actual leases, but is not timely as to hypothetical leases.").  Additionally, the Tribe maintains that the 1996 Arthur Andersen Report "was not sufficient to draw any conclusion on the accuracy of the accounting of the Tribe's trust funds, *or the acceptability of the investment management of those funds by the Government*."  Pl. Resp. at 10 (emphasis added).  As explained in *Goodeagle*, however, the ITAS provisions do not cover "the acceptability" of the government's "investment management" decisions.  111 Fed. Cl. at 724–25; *see also* Pl. Supp. Br. at 3 (admitting that the 1996 Arthur Andersen Report "contains no information relating to . . . the Government's duties to . . . *properly invest*" funds (emphasis added)).

[55] The Tribe addresses the statute of limitations issues at length in its Complain, *see* Compl. ¶¶ 57–67, but nowhere alleges facts or even legal conclusions to support the favorable application of the continuing claims doctrine.

pursuant to RCFC 12(b)(6). Def. Mot. at 32. The Complaint largely consists of "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action." *See Twombly*, 550 U.S. at 555 (citations omitted). The law does not require that this Court assume those legal conclusions to be true. In other instances, the Complaint simply fails to plead "facts which give rise to a plausible inference that the government" is liable for the misconduct that the Tribe claims. *See Todd Const.*, 656 F.3d at 1316. Accordingly, and for the reasons that follow, the Court **GRANTS** the government's motion to dismiss Counts II, III, and IV for failure to state a claim on which the Court may grant relief.

### 1.    Count II Fails To State A Claim

On December 17, 1964, the Tribe "entered into a Final Stipulation For Entry Of Final Judgment [with the government] . . . in which the Chemehuevi claims in Dockets 351 and 351-A were settled, after deductions, credits and offsets, for a net judgment of $996,834.81." Compl. ¶ 47. By the Act of September 25, 1970, 84 Stat. 868, Congress "authorized for distribution in *per capita* payments to tribal members" the $996,834.81. *Id.* ¶ 48 (emphasis in original). The Tribe's Complaint contains no factual allegations that any of the per capita payments actually remain unclaimed, yet the Tribe now asserts that it is "entitled to claim, and does claim, all unclaimed per capita payments" and alleges, in Count II of its Complaint — and again without any factual allegations to support the claim — that the government "breached its fiduciary duties owed to the Chemehuevi Tribe" with respect to these funds. *Id.* ¶¶ 50, 94. Accordingly, Count II of the Tribe's Complaint fails to state a claim as a matter of law.

Section 164 of Title 25 of the United States Code provides:

> Unless otherwise specifically provided by law, the share of an individual member of an Indian tribe or group in a per capita or other distribution, individualization, segregation, or proration of Indian tribal or group funds held in trust by the United States, or in an annuity payment under a treaty, heretofore or hereafter authorized by law, and any interest earned on such share that is properly creditable to the individual shall be restored to tribal ownership if for any reason such share cannot be paid to the individual entitled thereto and remains unclaimed for a period of six years from the date of the administrative directive to make the payment, or one year from September 22, 1961, whichever occurs later.

Section 115.820 of Title 25 of the Code of Federal Regulations provides (emphasis added):

> Funds in a returned per capita account will not automatically be returned to a tribe.  However, **a tribe may apply under 25 U.S.C. 164 and Public Law 87–283, 75 Stat. 584 (1961), to have the unclaimed per capita funds transferred to its account for the tribe's use after six years have passed from the date of distribution**.

Despite the plain language of the regulation, the Tribe asserts that "[b]y filing its claim in this Court, the Tribe has 'applied' for the transfer of the unclaimed funds."  Pl. Resp. at 40–41.  The Court, however, need not decide whether the Tribe's filing of its claim in this Court constitutes a proper application for the transfer of the unclaimed funds under the statute and regulation because the Tribe fails to include *any* factual allegation that *any* unclaimed funds actually exist.[56]  Put differently, the Tribe's inability to allege that the government actually possesses any funds which the Tribe may or may not be entitled to claim is fatal to the Tribe's claim that the government has somehow mismanaged said funds.  *See Iqbal*, 556 U.S. at 662 (a plaintiff must "plead[ ] factual content that allows [a] court to draw the reasonable inference that the defendant is liable for the misconduct alleged" to survive a 12(b)(6) motion).

Further still, even if the Tribe alleged facts substantiating that the government held unclaimed per capita funds in trust for the Chemehuevi, the Complaint consists of nothing more than legal conclusions regarding the government's alleged breaches of its fiduciary duties.  *See* Compl. ¶¶ 95(a)–(e) (concluding without factual allegations that the government breached its fiduciary duties by "[f]ailing to invest, or underinvesting," "[f]ailing to account for," "[f]ailing to properly manage," "[f]ailing to obtain the highest available rates of interest" on, and "[f]ailing to deposit and/or properly invest" the subject funds).  The Court may not presume these legal conclusions are true for the purposes of resolving a RCFC 12(b)(6) motion to dismiss, nor will the Court permit the Tribe to engage in a fishing expedition into alleged mismanagement of funds that the government may have already properly distributed to the Chemehuevi's members.

The Tribe, erroneously relying on this Court's decision in *Quapaw Tribe of Oklahoma v. United States*, 120 Fed. Cl. 612 (2015), asserts that "there is no need for the Tribe to allege that one or more of the per capita payments remain unclaimed."  Pl.

---

[56] The Court is highly skeptical — putting it mildly — that the Tribe's Complaint satisfies the application for funds contemplated by the regulatory scheme.  *See Sandvik Steel Co. v. United States*, 164 F.3d 596, 599–600 (Fed. Cir. 1998) (holding that "detailed . . . determination procedures that [agency] has provided constitute precisely the kind of administrative remedy that must be exhausted before a party may litigate the validity of the administrative action"); *see also Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1254 (Fed. Cir. 2015) (explaining that "the exhaustion doctrine recognizes the notion, grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer" (internal quotation omitted)).

Resp. at 41 (internal quotation omitted).  That position misstates both the pleading standards under this Court's rules and the decision in *Quapaw*, 120 Fed. Cl. at 617.

First, the proposition that a complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement'" is black letter law.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Permitting the Tribe to pursue a claim for unclaimed per capita payments when the Tribe does not (and apparently cannot) even assert that any unclaimed per capita payments exist would fly in the face of more than a decade of Supreme Court and Federal Circuit precedent.

Second, this Court's decision in *Quapaw*, 120 Fed. Cl. at 617, supports the conclusion that the Tribe's equivocal legal conclusions in Count II of the Tribe's Complaint fail to state a claim as a matter of law.  Despite the Tribe's cherrypicked quotations, the plaintiff in *Quapaw*, prior to initiating suit in this Court, "filed suit in the U.S. District Court for the Northern District of Oklahoma" and entered into a settlement agreement under which "a not-for-profit Tribal entity, would prepare an analysis of the Government's management of Tribal assets."  120 Fed. Cl. at 614.  That entity reviewed government records and prepared for the plaintiff an accounting, which the plaintiff then relied on" to claim in this Court that "25 percent of the distributions were unaccounted for and could not have been made."  *Id.* at 618.  Accordingly, the plaintiff in *Quapaw* plausibly alleged facts that supported the plaintiff's claim that the government both possessed and mismanaged the plaintiff's unclaimed per capita distributions.[57]  Here, the Tribe relies on nothing more than equivocal statements that unclaimed per capita distributions may or may not exist and that the government may or may not have mismanaged any such funds.  *See* Compl. ¶¶ 94–95.  Such statements are insufficient to survive a motion to dismiss pursuant to RCFC 12(b)(6).

In light of overwhelming binding and persuasive precedent, the Court **GRANTS** the government's motion to dismiss Count II of the Tribe's Complaint for failure to state a claim as a matter of law.

---

[57] Indeed, the facts *Quapaw* comport with this Court's views regarding the procedures the Tribe should have followed to pursue its claim for a more robust accounting.  *See infra* Section IV.A.3. In *Quapaw*, the Tribe first sued the government in district court and, as part of a settlement, received an accounting.  120 Fed. Cl. at 614.  Subsequently, the Tribe sued the government in this Court for the monetary damages, which the accounting had revealed.  *Id.* at 618.

2.      **Count III Fails To State A Claim**

In 1952, the State of Arizona filed a complaint against the State of California "over how much water each State has a legal right to use out of the waters of the Colorado River and its tributaries."  *Arizona v. California*, 373 U.S. 546, 551 (1963).  In 1953, the United States intervened in the litigation and "asserted claims to waters in the main river and in some of the tributaries for use on Indian Reservations," including the Chemehuevi reservation.  *Id.* at 595.  The United States Supreme Court appointed a Special Master "to take evidence, find facts, state conclusions of law, and recommend a decree," and the Special Master "found both as a matter of fact and law that when the United States created these reservations or added to them, it reserved not only land but also the use of enough water from the Colorado **to irrigate the irrigable portions of the reserved lands**."  *Id.* at 551, 596 (emphasis added).  The Supreme Court "concluded, as did the Master, that the only feasible and fair way by which reserved water for the reservations can be measured is irrigable acreage" and found "[t]he various acreages of irrigable land . . . to be reasonable."  *Id.* at 601.

Accordingly, the Supreme Court issued a final decree, allocating to the Tribe "annual quantities [of Colorado River water] not to exceed (i) 11,340 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use **required for irrigation** of 1,900 acres and for the satisfaction of related uses, **whichever of (i) or (ii) is less**."  *1964 Arizona Decree*, 376 U.S. at 344 (emphasis added).  Count III of the Tribe's Complaint notes that the Tribe "has used or consumed on the Chemehuevi Reservation only a small portion of the Tribe's annual allocation of water from the Colorado River" and contends that the government has taken the remainder "without any payment to the Tribe of compensation."  Compl. ¶¶ 107, 118.  Count III fails to state a claim as a matter of law.  *See* Def. Mot. at 37.

The Fifth Amendment to the United States Constitution "guarantee[s] that private property shall not be taken for a public use without just compensation."  *Armstrong v. United States*, 364 U.S. 40, 49 (1960).  The test for determining whether an unconstitutional taking of property has occurred requires consideration of the extent to which the government action may interfere with the owner's "distinct [] expectations."  *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).  Here, there is no viable takings claim because the Tribe has failed to allege any interference with the Tribe's water rights under *Arizona v. California*.

In its final decree, the Supreme Court allocated to the Tribe "annual quantities [of Colorado River water] not to exceed (i) 11,340 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use **required for irrigation** of 1,900 acres and for the satisfaction of related uses, **whichever of (i) or (ii) is less**."  *1964 Arizona Decree*, 376 U.S. at 344 (emphasis added).  Thus, the Tribe's water rights "are usufructuary in nature—meaning that the property right 'consists not so much of the fluid itself as the advantage of its use'—

[and] the Tribe has no right to any particular molecules of water, either on the Reservation or up- or downstream, that may have been used or diverted by the government." *Crow Creek Sioux Tribe*, 900 F.3d at 1357 (quoting *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1353 (Fed. Cir. 2013)). The Tribe has not alleged that the United States has taken any action which has prevented the Tribe from obtaining 11,340 acre-feet of mainstream water or the quantity of mainstream water necessary **for irrigation** of 1,900 acres of reservation land. Rather, the Tribe has admitted that it has used "only a small portion" of this water and seeks to sell off or lease the remaining water. Compl. ¶¶ 107, 118. "In so arguing, the Tribe appears to misunderstand what its water rights entail." *Crow Creek Sioux Tribe*, 900 F.3d at 1357.

The Supreme Court did not allocate the Tribe unrestricted rights to a certain quantity of water; the Tribe solely possesses the right to use a certain amount of water "for irrigation." *1964 Arizona Decree*, 376 U.S. at 344; *see Arizona v. California*, 373 U.S. at 601 ("How many Indians there will be and what their future needs will be can only be guessed. We have concluded, as did the Master, that the only feasible and fair way by which reserved water for the reservations can be measured is irrigable acreage. The various acreages of irrigable land which the Master found to be on the different reservations we find to be reasonable."); *id.* at 596 ("[W]hen the United States created these reservations or added to them, it reserved not only land but also the use of enough water from the Colorado to irrigate the irrigable portions of the reserved lands."). Accordingly, just as the Federal Circuit held in *Crow Creek Sioux Tribe*, the "Tribe's [water] rights, which give the Tribe the right to use sufficient water to fulfill the purposes of the Reservation, simply cannot be injured by government action that does not affect the Tribe's ability to use sufficient water to fulfill the purposes of the Reservation. The complaint in this case does not allege that the challenged government action has such an effect." 900 F.3d at 1357; *see also* Tr. at 79:15–17 ("MR. MARZULLA: . . . I did not mean to suggest to the Court that the water right is something other than a usufruct.").

Accordingly, the Court **GRANTS** the government's motion to dismiss Count III of the Tribe's Complaint pursuant to RCFC 12(b)(6).

### 3.    Count IV Fails To State A Claim

In its Complaint, the Tribe admits that, by the Act of July 8, 1940, 54 Stat. 744, the government took "7,776.14 acres" of the Tribe's land — including lands lying along twenty-one miles of the Colorado River shoreline — for the public purpose of building the Parker Dam. Compl. ¶¶ 23, 27. The Tribe further admits that, at the time of the taking, the government compensated the Chemehuevi for the land by placing $108,104.95 in a United States Department of the Treasury account for the benefit of the Tribe. *Id.* ¶ 30. The Tribe then notes that, on November 1, 1974, by order of the Secretary of the Interior, the government returned "equitable title to lands lying along twenty-one (21) miles of shoreline along the Colorado River . . . to the Chemehuevi

Tribe after thirty-three (33) years." *Id.* ¶ 125.  In the face of these facts, Count IV of the Tribe's Complaint alleges that the United States' "long-term confiscation and deprivation of . . . twenty-one (21) miles of Colorado River shoreline for thirty-three (33) years without any payment to the Tribe of compensation for the use, lease, and/or temporary taking of the shoreline and related assets, improvements and riparian rights, amounts to a taking of the Tribe's property without just compensation in violation of the Fifth Amendment." *Id.* ¶ 128.  Count IV fails to state a claim as a matter of law for a temporary taking of the Tribe's shoreline property from 1941 until 1974.

The Fifth Amendment to the United States Constitution "guarantee[s] that private property shall not be taken for a public use without just compensation." *Armstrong*, 364 U.S. at 49.  Accordingly, "the text of the Fifth Amendment imposes two conditions on the exercise of [government] authority:  the taking must be for a 'public use' and 'just compensation' must be paid to the owner."  *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 231–32 (2003) (quoting U.S. Const., Amend. V.).  "Temporary takings are not different in kind from permanent takings."  *Wyatt v. United States*, 271 F.3d 1090, 1097 n.6 (Fed. Cir. 2001).  Rather, "[a] temporary taking occurs when what would otherwise be a permanent taking is temporally cut short."  *Id.*

In this case, the government, by the Act of July 8, 1940, 54 Stat. 744, purported to permanently take "7,776.14 acres" of the Tribe's land for the public purpose of building the Parker Dam.  Compl. ¶¶ 23, 27.  The government then paid just compensation to the Tribe in the amount of $108,104.95 to permanently take that land, much of which the government thought would be flooded by the construction and operation of the Parker Dam.  *Id.* ¶ 30.  The Parker Dam project, however, apparently did not flood all the land that the government took and for which the government compensated the Tribe.  Thus, the government, by order of the Secretary of the Interior on November 1, 1974, returned "equitable title to lands lying along twenty-one (21) miles of shoreline along the Colorado River" that were not flooded.  *Id.* ¶ 125.

The Tribe does not claim that the government forced the Tribe to return any of the money that the government originally had paid to the Tribe for the permanent taking.  Indeed, the Tribe already has double recovered, in some sense, by both retaining the compensation that the government originally had provided for the permanent taking and also now possessing title to the land that the government originally thought it would need for the Parker Dam project.  Now, the Tribe seeks to triple recover by forcing the government to pay again for its so-called temporary taking of land the government already paid for and then returned.  The Tribe does not cite to a single case in which any court has permitted such recovery, and this Court refuses to be the first.

As the Tribe already has received just compensation for the land, Count IV of the Tribe's Complaint fails to state a claim as a matter of law.  To the extent the Tribe seeks additional compensation for the original taking, that claim is time-barred, as explained *supra.*

The Court also **GRANTS** the government's motion to dismiss the portion of Count IV of the Tribe's Complaint that includes a separate claim for alleged mismanagement of funds that the government purportedly deposited into "suspense accounts" or "special deposit accounts" for the Tribe.  *See* Compl. ¶¶ 133–37.  First, the Complaint is devoid of any factual allegations that the government mismanaged any funds held in any suspense accounts; rather, the Complaint seeks "damages for ***any* and all** mismanagement of the Tribe's BIA suspense and/or special deposit accounts that were maintained from time to time for the Tribe by the BIA during the time period from 1946 until the present." *Id.* ¶ 137 (emphasis added).  The Tribe's inability to "plead[ ] factual content that allows [the] court to draw the reasonable inference that the defendant is liable for the misconduct alleged" is fatal to the Tribe's claim.  *Iqbal*, 556 U.S. at 662.  Second, the Tribe has not alleged that the government had any specific legal duty that it owed to the Tribe with regard to any suspense accounts.  Indeed, the government correctly explains that 25 C.F.R. § 115.002 defines a "special deposit account" as "a temporary account for the deposit of trust funds that cannot immediately be credited to the rightful account holders" and that 25 C.F.R. § 115.901 provides that the government will only disburse funds after "the BIA['s] certification of the ownership of the funds."  *See* Def. Mot. at 34.

A plaintiff, of course, might properly claim that it is the rightful owner of certain funds in a particular suspense account.  The Tribe cannot, however, properly maintain its current claim, in which the Tribe equivocally opines that it may or may not have been entitled to funds in some unidentified suspense accounts which the government may or may not already have disbursed to the Chemehuevi.  *See DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) ("the price of entry, even to discovery, is for the plaintiff to allege a factual predicate concrete enough to warrant further proceedings[;] . . . [c]onclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition"); *Reich v. Lopez*, 38 F. Supp. 3d 436, 459 (S.D.N.Y. 2014) ("reliance on 'conclusory' allegations is generally not enough . . . as it may lead to an unwarranted 'fishing expedition'" (internal citation omitted)), *aff'd*, 858 F.3d 55 (2d Cir. 2017); *Oreman Sales, Inc. v. Matsushita Elec. Corp. of Am.*, 768 F. Supp. 1174, 1180 (E.D. La. 1991) ("plaintiff may no longer file a conclusory complaint not well-grounded in fact [and] conduct a fishing expedition for discovery").  The Complaint does not include sufficient factual allegations to proceed, and, accordingly, the Court **DISMISSES** this aspect of Count IV of the Tribe's Complaint.

## *CONCLUSION*

The Court has considered all of the parties' arguments.  Given the Court's disposition, those arguments not otherwise addressed herein are unnecessary to the ultimate resolution of this case.

The Court **GRANTS** defendant's motion and **DISMISSES** the Complaint pursuant to RCFC 12(b)(1) and, in the alternative (with respect to Counts II – IV), RCFC 12(b)(6).  No costs.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge